**PARSONS STEEL, INC., et al.,**
Plaintiffs-Appellants,

v.

**FIRST ALABAMA BANK OF MONT-GOMERY, N.A., Defendant-Appellee.**

No. 81–7556.

United States Court of Appeals, Eleventh Circuit.

June 25, 1982.

---

Frank M. Wilson, Beasley & Wilson, Jere L. Beasley, Montgomery, Ala., for plaintiffs-appellants.

M. R. Nachman, Jr., Steiner, Crum & Baker, Montgomery, Ala., for defendant-appellee.

Before GODBOLD, Chief Judge, MERRITT * and HENDERSON, Circuit Judges.

* Honorable Gilbert S. Merritt, U. S. Circuit Court Judge for the Sixth Circuit, sitting by designation.

MERRITT, Circuit Judge:

The issue in this case is whether a bank is prohibited under the 1970 Amendments to the Bank Holding Company Act, 12 U.S.C. §§ 1972–75 (1976), from conditioning additional credit on a change of corporate management and majority stock ownership. Parsons Steel, Inc. of Montgomery was a wholly owned subsidiary of the plaintiff company, Parsons Steel, Inc., of Mobile, owned by co-plaintiffs Melba and Jim Parsons. The subsidiary had been heavily financed on an on-going basis since 1976 by the defendant First Alabama Bank of Montgomery. By the fall of 1978, the bank had outstanding fully secured loans of one million dollars and was the subsidiary's largest creditor.

At about this time the subsidiary began experiencing financial difficulty and anticipated inability to repay its debts. Mr. Parsons and an agent of the bank discussed refinancing the subsidiary's debt. The discussion between Parsons and the bank not only focused on refinancing but also included an unsuccessful attempt to sell the subsidiary to an out-of-town corporation. After the first attempt to sell fell through, the bank contacted a local businessman, Michael Orange, with whom the bank had done business, to determine if he were interested in buying the subsidiary. Although Orange declined to buy the company, he apparently offered to take over management of the company for a fee plus a stock option.

The plaintiffs claim that the bank conditioned the grant of any additional credit on Parson's agreement to accept Orange as the manager of the subsidiary with an option to acquire a majority interest in the subsidiary in lieu of other compensation. The bank claims that it never agreed to extend any credit and did not require that Orange be granted the controlling stock option. The jury found that the bank did condition the extension of credit on the appointment of Orange as manager and on granting the option.

The District Court, although denying the defendant's motions for summary judgment and a directed verdict, heard all the evidence and ultimately granted the bank's motion for judgment notwithstanding verdict. The plaintiffs contend that in granting the judgment n.o.v., the District Court usurped the function of the jury and substituted its judgment of the credibility of the witness for that of the jury.

■ Taking the facts in the light most favorable to plaintiffs, we find, as a matter of law, that a bank's requirement that financial control of an enterprise be placed in new hands when necessary to protect its investment before extending further credit, does not constitute a violation of the statute, 12 U.S.C. § 1972, absent evidence of a "tying" arrangement. We, therefore, affirm the judgment of the District Court.

Section 1972 of the Act provides in relevant part that "[a] bank shall not in any manner extend credit ... on the condition ... that the customer provide some additional credit, property, or service to such bank, *other than those related to and usually provided in connection with a loan, ...*" 12 U.S.C. § 1972(1) (1976) (emphasis added). The appellants' arguments rest primarily on the single premise that a jury's finding that it is "unusual" for a bank to require a change in management and ownership as a condition to extending additional credit to an already heavily indebted enterprise in fear of default is sufficient to establish liability under the Act.

■ Although the language of the Act, when read in isolation, appears broad enough to encompass such a rule, the legislative history of the statute leaves no doubt that its intent is more narrow. The original focus of the Bank Holding Company Act was the regulation of the power of bank holding companies so as to prevent a small number of powerful banks from dominating commerce and to ensure a separation of economic power between banking and commerce. See Sen.Rep.No.91–1084, 91st Cong., 2nd Sess., reprinted in [1970] U.S. Code Cong. & Ad.News 5519, 5520; 116 Cong.Rec. 32127 (1970). With the 1970 Antitying Amendment, however, Congress in-

tended to reach anticompetitive practices of even smaller banks, which notwithstanding their comparative size, were able to exert economic power over businesses because of their control over credit. *Id.* at 5535. In regulating potential misuse of such economic power, however, Congress was concerned that the federal regulation not be too expansive. First, Congress did not intend to "interfere with the conduct of appropriate traditional banking practices," *id.*, and did not intend to prohibit attempts by banks to protect their investments where no anticompetitive practices were involved. A *per se* rule prohibiting banks from devising particular methods for protecting themselves against default in various situations could have the undesirable effect of discouraging banks from granting extensions of credit, and thus precipitate foreclosure or bankruptcy. There is no support for such a rule in the legislative history. Indeed, an earlier proposed version of the antitying provision which would have potentially subjected virtually all conditions placed by banks on extensions of credit requiring credit customers to purchase additional services from the bank to review by the Federal Reserve Board, was amended to incorporate the narrower language of the statute which explicitly permits banks to take certain actions to protect their investments while prohibiting anticompetitive practices. *See* Remarks of Senator Bennett, 116 Cong.Rec. 32125 (1970). Second, it appears that Congress was concerned that the proposed federal banking regulation not intrude upon recognized state authority over the banking process. In proposing the version of § 1972 that was ultimately enacted Senator Bennett noted that "[t]o provide federal bank regulatory restrictions on state banking practices without reference to antitrust considerations would be a reversal of a long-standing policy under which State law regulates State banking practices...." 116 Cong.Rec. at 32130–31. It appears, therefore, that the purpose and effect of § 1972 is to apply the general principles of the Sherman Antitrust Act prohibiting anticompetitive tying arrangements specifically to the field of commercial banking, without

requiring plaintiffs to establish the economic power of a bank and specific anticompetitive effects of tying arrangements:

> [T]ying arrangements involving a bank are made unlawful by this section without any showing of specific adverse effects on competition or other restraints of trade and without any showing of some degree of bank dominance or control over the tying product or service. Moreover, as individual tying arrangements may involve only relatively small amounts, the prohibitions of this section are applicable regardless of the amount of commerce involved.

Sen.Rep.No.91–1084, 91st Cong., 2nd Sess. [1970], U.S.Code Cong. & Admin.News 5519, 5558 (Supplementary Views of Edward W. Brooke).

■ Given the specific purposes for which the statute was enacted, it is not sufficient in order to establish a violation of the Act to show simply that a particular method of protecting against default is not commonly used. Unless the "unusual" banking practice is shown to be an anticompetitive tying arrangement which benefits the bank, it does not fall within the scope of the Act's prohibitions.

Our decision here is consistent with the former Fifth Circuit's interpretation of § 1972 in *Swerdloff v. Miami National Bank*, 584 F.2d 54 (5th Cir. 1978). In *Swerdloff* the bank allegedly required the owners of an indebted corporation to sell 51% of the company stock to a competitor, also a customer of the Bank. The issue there was whether the fact that a bank required the sale of a business to a third party where no benefit to the bank was alleged, constituted a 'tying arrangement' under the Act. The Court held that where a bank is alleged to have imposed a requirement that the business be sold as a condition of granting further credit, benefit to the bank may be assumed for the purposes of a motion on the pleadings. In the instant case, the District Court, consistent with *Swerdloff*, refused to dismiss the case on the pleadings and in fact denied the Bank's motions for summary judgment and

directed verdict. The District Court allowed the plaintiffs the opportunity to establish the existence of a prohibited tying arrangement. The plaintiffs were able to establish only that the requirement allegedly imposed upon them was an unusual banking practice. But to establish a violation of § 1972, the "unusual banking practice" must be shown to be a tying arrangement. The plaintiffs must prove the existence of "anti-competitive practices which require bank customers to accept ... some other service or product ... in order to obtain the bank product or service they desire." [1970] U.S.Code Cong. & Ad.News at 5535.

■ The plaintiffs have here failed to establish facts from which the existence of a tying arrangement benefitting the bank could reasonably be inferred. The bank did not tie the loan to any other bank product, service or benefit, and thus there is no "tied" product or service. The subsidiary was in financial difficulty and the bank was simply reluctant to grant additional credit. Parsons was in the market for a purchaser of the subsidiary he controlled. The fact that Mr. Orange had been a customer of the bank and that his name was suggested by the bank does not establish a "tie-in." There is no evidence that the bank would benefit in any way other than by getting additional protection for its investment. That is not a tying arrangement. The allegation that the bank wanted to induce Mr. Orange to do additional business by offering him a favorable deal has no factual support. The District Court's grant of a judgment notwithstanding verdict was thus justified.

Other Circuits that have interpreted the amended Act are in accord with the view that § 1972 is intended to prohibit anticom-petitive tying arrangements, and that other uses of a bank's economic power to protect its investments are not affected by the Act. *Tose v. First Pennsylvania Bank*, 648 F.2d 879 (3rd Cir.), *cert. denied,* —— U.S. ——, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981) (bank's imposition of financial controls in order to protect its investment, even when a change in ownership is necessary, not a violation of the Act); *B.C. Recreational Industries v. First Nat'l Bank of Boston,* 639 F.2d 828 (1st Cir. 1981) (requirement that borrower in danger of default hire a specified general manager not a tying arrangement prohibited by the Act); *see also, McCoy v. Franklin Savings Ass'n,* 636 F.2d 172 (7th Cir. 1980); *Duryea v. Third Northwestern Nat'l Bank,* 606 F.2d 823 (8th Cir. 1979); *Costner v. Blount Nat'l Bank,* 578 F.2d 1192 (6th Cir. 1978); *Clark v. United Bank of Denver,* 480 F.2d 235 (10th Cir.), *cert. denied,* 414 U.S. 1004, 94 S.Ct. 360, 38 L.Ed.2d 240 (1973).

The subsidiary was indebted to the bank by over one million dollars, and was faced in the fall of 1978 with the prospect of default in the near future if existing debts were not refinanced. The bank was unwilling to extend further credit to Parsons. Under these circumstances, assuming that the bank conditioned the grant of additional credit upon a change in management and ownership, there is no violation of § 1972. Accordingly, the judgment of the District Court is AFFIRMED.