C. Fred IDEN, Katherine Iden, the Appliance & Furniture Mart, Inc., a West Virginia corporation, C. Fred Iden Builders, Inc., a West Virginia corporation, and Fair-Way Motors, Inc., a West Virginia corporation, Plaintiffs,

v.

ADRIAN BUCKHANNON BANK, a West Virginia corporation, Defendant and Third-Party Plaintiff,

v.

John E. KENNEDY, Third-Party Defendant.

Civ. A. No. 83–0342–E(K).

United States District Court, N.D. West Virginia, Elkins Division.

April 27, 1987.

---

Henry C. Bias, Jr., Charleston, W.Va., for plaintiffs.

James S. Arnold, Charleston, W.Va., for Adrian Bank.

Terry D. Reed, Buckhannon, W.Va., for Kennedy.

### MEMORANDUM OPINION AND ORDER

KIDD, District Judge.

Pending before the Court are defendant's motion to dismiss and motion for summary judgment. These motions having been fully briefed, are now in a posture to be ruled upon by the Court.

The Court, having reviewed the record herein, finds that there is no genuine issue as to any *material* fact. This is not to say there are no disputed issues of fact. On the contrary, as is evident by a reading of the opposing briefs, there exists a monumental morass of conflicting conclusionary claims and allegations concerning the parties' actions. However, the Court, having waded through the moorland of this record, is of the opinion that there are no *genuine* issues of *material* fact viewed in a light most favorable to the plaintiffs, and the defendant is entitled to judgment as a matter of law.

The individual plaintiffs are C. Fred Iden and Katherine Iden, husband and wife.[1] The corporate plaintiffs are closely held Iden family corporations, primarily owned and controlled by Mr. Iden, but in which the other Iden family members have interests and also serve as corporate officers.

The defendant is the Adrian Buckhannon Bank, (hereinafter "Bank"), a West Virginia state banking institution. The plaintiffs have transacted business with the Bank for over twenty years, having had various types of accounts and having utilized the full services offered by the Bank.

In 1977, approximately, the plaintiff corporations "experienced cash flow problems" requiring the plaintiffs, both corporate and individual, to borrow substantial sums of money from the Bank to continue operations. The plaintiffs, having conducted business in the community for a number of years, were well known by the Bank. Due to the close relationship and frequency of transactions between the parties, the plaintiffs placed confidence and reliance upon the Bank and its officers. The relationship was such that officers of the Bank would notify plaintiffs by telephone when an obligation was due. Whereupon, the

---

1. Barbara Rexroad and Marie Manley, the twin daughters of the Idens, were also plaintiffs. However, on August 21, 1985, an Agreed Order was entered dismissing these plaintiffs' claims against the Bank, and the Bank's counterclaims.

plaintiffs, with their agreement and that of the Bank, would endorse blank or incomplete promissory notes. The principal sums, interest notes, and other terms of each note would then be entered by the Bank when the plaintiffs' previous notes came due.

Prior to 1981, plaintiffs dealt with V. Russell Freed, formerly president of the Bank. In late 1981, due to deteriorating health, Mr. Freed stopped performing his banking duties, including his dealings with the plaintiffs. Plaintiffs have not been able to point to any conduct by Mr. Freed nor the Bank prior to 1981 which they question in this case.

The plaintiffs, in late 1981, began dealing with John E. Kennedy, a vice-president of the Bank. Mr. Kennedy was involved directly with the plaintiffs in only one transaction with Mr. Iden on April 23, 1982. This transaction involved Mr. Iden's execution of from sixteen to eighteen blank notes which, as had been the parties' custom and practice, were used to pay the principal and interest on outstanding notes.

Mr. Kennedy, though, converted the proceeds of two of Mr. Iden's blank notes, to himself, making the principal amount of each note for $10,000. As a result of Mr. Kennedy's conduct, $20,000 was added to Mr. Iden's account.

The Bank claims that it first became aware of these two improper loans in March 1983, shortly after another Kennedy transaction involving a fictitious person was uncovered. The Bank immediately notified the appropriate regulatory agencies and the FBI. Mr. Kennedy was subsequently convicted of two counts of embezzlement. On July 25, 1984, the Bank credited plaintiff Appliance & Furniture Mart's loan, upon which Mr. Iden was a co-maker, $26,165.40, which represented the principal and interest on the two fraudulent notes.

In August 1982, the Bank employed a new chief executive officer, Larry B. Garner. Mr. Garner, believing plaintiffs' loans to be seriously delinquent with no repayment schedules and inadequate documentation of plaintiffs' ability to repay, commenced negotiations with plaintiffs on re-structuring their loans. The Bank required that the loans should be secured by additional collateral.

The Bank primarily negotiated with former plaintiffs Rexroad and Manley. Mrs. Rexroad and Mrs. Manley retained counsel who negotiated with the Bank concerning the loans. By December 1982, the following consolidation was structured:

(1) Furniture Mart became the obligor on a note in the principal amount of $310,584.30 with plaintiff Iden as co-maker. This loan consolidated and discharged four notes of Furniture Mart totalling $162,363.44, of which $84,173.52 was secured and nine notes of plaintiff Iden individually totalling $160,984.78, of which $44,229.35 was secured. No payments were due under this note until its maturity in 360 days at 10% interest per annum, and additional collateral to secure to the loan was:

A. A UCC–1 on the equipment, accounts receivable, and inventory of Furniture Mart;

B. A second deed of trust on the premises occupied by Furniture Mart; and

C. A third deed of trust on approximately two acres owned by plaintiffs Iden in Canaan Valley.

(2) Iden Builders executed a note in the principal sum of $54,896.10 with plaintiff Iden as co-maker. This loan consolidated and discharged two previous loans to Iden Builders totalling $54,847.78 which were at least partially secured. The terms of this note were the same as the aforesaid loan to Furniture Mart, and the obligation was secured by a fourth deed of trust on three tracts of real estate in the names of plaintiffs Iden.

(3) Fair-Way executed a note in the principal sum of $53,999.54 with plaintiffs Iden as co-makers. This loan consolidated and discharged three previous loans totalling $53,952.00 of which $22,872.86 was secured. The terms of this note were identical to those to Furniture Mart and Iden Builders, and the collateral provided was second deeds of trust on tracts in the name of former plaintiff Manley. The Bank received the written request of Manley to

accept her deeds of trust to secure this obligation.

Although plaintiffs allege that this consolidation was brought about as a result of extortion by the Bank, there simply is no evidence supporting their allegations. Of course, the Bank, in its negotiations with the plaintiffs, exercised some leverage through the usual remedies available to any bank to collect on notes and refusal to extend credit, but this in no way can be construed to be extortion.

One year later, on December 12, 1983, the Bank notified plaintiffs Mr. and Mrs. Iden and Fairway Motors, Inc., that the consolidated loans were due on December 17, 1983, and full payment was demanded. Included in these notes were two fraudulent notes by Mr. Kennedy. The Bank acknowledges this, claiming it was a mistake. The Bank claims that it had no intention of collecting on these two notes considering it had already notified the plaintiffs that full restitution would be made. Furthermore, it had fully cooperated with the FBI once it discovered Mr. Kennedy's illegal activities.

The Bank received $200,000 in July 1982 by the sale of the premises of Furniture Mart, which was credited to plaintiffs' account. Also, the principal and accrued interest on the two fraudulent loans by Mr. Kennedy was credited to the account.

On December 16, 1983, one day before the consolidated loans were due, the plaintiffs filed this civil action against the defendant. Plaintiffs' complaint is based upon two causes of action. First, plaintiffs allege a civil RICO claim under 18 U.S.C. § 1962. Second, plaintiffs allege an antitying claim, under 12 U.S.C. § 1972.

Count One of this action is based upon 18 U.S.C. § 1962. Unfortunately, plaintiffs do not specify in their complaint nor in their memorandum, which sub-section of § 1962 is being relied upon. In their brief, plaintiffs seem to argue all of the sub-sections together in support of their claim. However, the Court need not ferret out plaintiffs' civil RICO claim because the plaintiffs have failed to allege nor is there evidence of an element essential to all of the sub-sections of § 1962.

In order to maintain any action under 18 U.S.C. § 1962, the plaintiffs must establish that the Bank engaged in a pattern of racketeering activity. This element involves two requirements. First, there must be racketeering activity. Second, there must be a pattern.

■ As to the racketeering activity, the plaintiffs claim that defendants committed extortion and mail fraud. The plaintiffs do not rely upon Mr. Kennedy's embezzlement, but upon subsequent acts of the Bank, namely, the Bank's restructuring of plaintiffs' loans.

Under West Virginia law, the elements of extortion are (1) a threat of injury to the character, persons or property of plaintiffs and (2) by means of that threat, money, property, or pecuniary benefits are extorted. *W.Va.Code*, § 61-2-13.[2] Viewing the evidence in a light most favorable to the plaintiffs, the Court can find no "threat of injury" by the Bank nor benefit "extorted" therefrom.

"Threat" in law is a declaration of intention to injure another by some unlawful act. *Black's Law Dictionary*, 1327 (5th Ed. 1979). The Bank did not threaten the plaintiffs in the legal sense of the word. The Bank was pursuing its legitimate efforts to restructure plaintiffs' loans that it considered seriously undercollateralized. The plaintiffs, through their daughters, negotiated with the Bank and were represented by counsel in the negotiations. Mrs. Iden, when asked, could recall no threats by the Bank. Mr. Iden also testified that there were no threats made to him nor did

**2.** § 61–2–13. Extortion or attempted extortion by threats; penalties.

If any person threaten injury to the character, person or property of another person, or to the character, person or property of his wife or child, or to accuse him or them of any offense, and thereby extort money, pecuniary benefit, or any bond, note or other evidence of debt, he shall be guilty of a felony, and, upon conviction, shall be confined in the penitentiary not less than one nor more than five years.

he believe he would be subjected to violence should he fail to timely pay the loans.

The restructuring of the plaintiffs' loans also reveal no indication of any "threat" in law by the Bank. The notes were payable in 360 days at 10% interest per annum, secured by second, third and fourth deeds of trust along with security in plaintiff Furniture Mart. Furthermore, the consolidated loans stemmed from a total of 431 loan transactions.

"Extort" in law is defined as follows: ... To gain by wrongful methods; to obtain in an unlawful manner, as to compel payments by means of threats of injury to person, property, or reputation. *Black's Law Dictionary*, 525 (5th Ed. 1979). The Bank did not gain any benefit by *wrongful* methods. The Bank did use normal, standard procedures used by creditors to enforce loans it made. Such procedures are foreclosure, restructuring and consolidation of delinquent and undercollateralized loans.

As cited earlier, the Bank and plaintiffs had extended negotiations involving the restructuring and consolidation of loans. It is not unreasonable to believe the plaintiffs preferred the restructure and consolidation to the alternative of default on the existing notes; that, in fact, the restructuring and consolidation may have been actually beneficial to the plaintiffs. It is true that these consolidations involved two notes fraudulently prepared by Kennedy. However, the actions of the Bank upon discovering Kennedy's embezzlement clearly show the Bank had no intention of enforcing these two notes. In fact, plaintiffs have been fully credited the amount, plus interest thereon.

Plaintiffs argue that the Bank's actions are comparable with the action of the defendants in *Battlefield Builders, Inc. v. Swango*, 743 F.2d 1060 (4th Cir.1984). In *Battlefield*, the Fourth Circuit found that when "defendants purposefully mislead plaintiff so as to extract additional benefits as the price for not causing plaintiff economic harm" then extortion is present. *Battlefield, supra* at 1063. Such is not the case at bar. In fact, the Fourth Circuit itself distinguished cases such as the case at bar by stating:

Of course, we distinguish the allegations here from a situation where a defendant enters into a contract with plaintiff in good faith and thereafter, concluding by reason of changed market conditions or other causes that he could not perform seeks a renegotiation of his contract obligations.

*Battlefield, supra* at 1063.

The Bank and plaintiffs had been dealing with each other in good faith for over ten years. The Bank then hired a new CEO who reviewed the plaintiffs' accounts. He believed them to be seriously delinquent with no repayment schedule and undercollateralized. These "other causes" commenced the renegotiation with the plaintiffs concerning their contract obligations. The result of these negotiations clearly does not rise to the level of extortion as was the case in *Battlefield. See, generally, I.S. Joseph Co., Inc. v. Lauritzen*, 751 F.2d 265 (8th Cir.1984) (groundless and bad faith threat to sue does not amount to extortion); *American Nursing Care of Toledo v. Leisure*, 609 F.Supp. 419 (D.C.Ohio 1984) (threat of litigation does not constitute criminal act).

■ Plaintiffs also claim that the Bank committed mail fraud. Essential to a claim of mail fraud is the existence of a scheme to defraud. There is no evidence at all that the Bank engaged in a scheme to defraud the plaintiffs. It is true that Kennedy defrauded the plaintiffs, but the Bank was equally deceived, and in fact suffered the loss. There was never any question but that the Bank would credit the plaintiffs the amount embezzled by Kennedy. As for the restructuring and consolidation of plaintiffs' loans by the Bank, the Court can find no evidence of any scheme to defraud.

■ As is quite clear, the Court is of the opinion that the plaintiffs have failed to show any racketeering activity by the Bank. Obviously, if there is no racketeering activity, there can be no pattern of racketeering activity. However, the Court believes, assuming arguendo that the Bank

engaged in the predicate acts of extortion and mail fraud, that there is no *pattern* of racketeering activity.

The Fourth Circuit has extensively discussed the element of a pattern of racketeering activity in a recent decision. *International Data Bank v. Zepkin,* 812 F.2d 149 (4th Cir.1987) In that case the Fourth Circuit stated:

> If the commission of two or more "acts" to perpetuate a single fraud were held to satisfy the RICO statute, then every fraud would constitute "a pattern of racketeering activity." It will be the unusual fraud that does not enlist the mails and wires in its service at least twice. Such an interpretation would thus eliminate the pattern requirement altogether.

*International Data Bank, supra* at 154–155. The Fourth Circuit went on to give analysis of various tests used by other circuits to determine whether a pattern exists. The Fourth Circuit decided not to apply a "mechanical test" but that it is a "matter of criminal dimension and degree."

Following the Fourth Circuit's guide, the Court believes that the Bank's action, assuming arguendo, that they did commit extortion and mail fraud, does not have the criminal dimension and degree to find a RICO pattern. On the contrary, "[t]o allow a 'pattern of racketeering' to flow from a single, limited scheme such as this one would undermine Congress's intent that RICO serve as a weapon against ongoing unlawful activities whose scope and persistence pose a special threat to social well-being. The present case does not involve a 'pattern of racketeering,' but ordinary claims of fraud best left to 'the state common law of frauds' and to 'well-established federal remedial provisions.' *Sedema,* 105 S.Ct. at 3293 (Marshall, J., dissenting)." *International Data Bank v. Zepkin, supra* at 155.

In conclusion, the Court holds that the plaintiffs' civil RICO claim should be dismissed. It is clear that "what [plaintiffs] have done is a transparent effort to use RICO to discourage legitimate efforts to collect a debt." *NCNB National Bank of North Carolina v. Tiller,* 814 F.2d 931 (4th Cir.1987). Accordingly, the Court GRANTS defendant's motion for summary judgment as to the civil RICO claim contained in the plaintiffs' first cause of action.

▮ Plaintiffs' second cause of action alleges an illegal tying scheme in violation of 12 U.S.C. § 1972. Plaintiffs allege in their amended complaint that:

> The foregoing actions of the defendant Bank amounted to illegal tying arrangements which are prohibited by the provisions of 12 U.S.C. Section 1972 with the result that the defendant Bank has violated said provisions of law and plaintiffs are therefore entitled to the relief set forth in 12 U.S.C. Section 1975.

The purpose of this Act was "not to interfere with the conduct of appropriate traditional banking practices but was intended to prohibit anti-competitive practices which require bank customers to accept or provide some other service or product or refrain from dealing with other parties in order to obtain the bank product or services they desire." *Swerdloff v. Miami National Bank,* 584 F.2d 54, 58 (5th Cir.1978). In *Parsons Steel v. First Alabama Bank of Montgomery,* 679 F.2d 242 (11th Cir. 1982), the court held that there was no violation of § 1972 where a bank conditioned the extension of additional credit upon a change in management and ownership. In that particular instance there was a likelihood of default upon certain loans in the very near future if such debts were not refinanced. The Court in *Parsons* stated:

> A *per se* rule prohibiting banks from devising particular methods for protecting themselves against default in various situations could have the undesirable effect of discouraging banks from granting extensions of credit, and thus precipitate foreclosure or bankruptcy. There is no support for such a rule in the legislative history. Indeed, an earlier proposed version of the antitying provision which would have potentially subjected virtually all conditions placed by banks on extensions of credit requiring credit customers to purchase additional services from the bank to review by the Federal

Reserve Board, was amended to incorporate the narrower language of the statute which explicitly permits banks to take certain actions to protect their investments while prohibiting anticompetitive practices. See Remarks of Senator Bennett, 116 Cong.Rec. 32125 (1970).

*Parsons, supra* at 245.

In *Rae v. Union Bank*, 725 F.2d 478, 480 (9th Cir.1984), the court held that the following elements must be alleged:

> First, the plaintiff must show that the banking practice in question was unusual in the banking industry. Second, the plaintiff must show an anti-competitive tying arrangement. Third, the plaintiff must demonstrate that the practice benefits the bank.

Plaintiffs fail to allege any of the three elements set forth under *Rae.* In fact, there are no allegations that the plaintiffs were required to perform some act unrelated to or not usually provided in connection with a loan. Further, nothing indicates that plaintiffs had to accept the Bank's services or product. It is not unusual banking practice to restructure or consolidate delinquent or problem loans. Indeed, sound banking practice encourages consolidation where it is safe, sound, and prudent.

Here, the Bank was obviously concerned that plaintiffs might not be able to meet their financial obligations to the Bank. As a result, the Bank requested that the loans be secured by additional collateral, or paid, or restructured. *See, Dannhausen v. First National Bank of Sturgeon Bay*, 538 F.Supp. 551, 563 (E.D.Wis.1982); *see, generally*, 74 ALR Fed. 578.

The Court is of the opinion that plaintiffs have failed to show a violation of 12, U.S.C. § 1972. Based upon the foregoing, the Court is of the opinion that the defendant's motion for summary judgment as to the plaintiffs' second cause of action should GRANTED.

Accordingly, it is hereby ORDERED that the defendant's motion for summary judgment regarding the first cause of action is hereby GRANTED; and defendant's motion for summary judgment as to the second cause of action is hereby GRANTED.

All that remains in this action is the Bank's counterclaim against the plaintiffs, which asserts state law pendant claims. Since the basis of this Court's jurisdiction is no longer present, the Court must decide whether it should retain jurisdiction over defendant's pendant state claims. The Court is guided by the principles set down by the United States Supreme Court:

> ... Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by providing for them a sure-footed heading of applicable law. Certainlly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

*Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) (footnote omitted).

In *Fox v. Custis*, 712 F.2d 84 (4th Cir. 1983), the Fourth Circuit held that once the federal question was dismissed, "the appropriate course would have been for the district court, in an excercise of discretion, to remand to [the state court the state pendant claim]." *Supra* at 89–90 (footnote omitted). Therefore, the Court is of the opinion that this action should be remanded to the Circuit Court of Upshur County, West Virginia, for determination of defendant's state pendant counterclaims.

Accordingly, it is so ORDERED.

The Clerk is directed to transmit certified copies of this Memorandum Opinion and Order to counsel of record herein and to the Circuit Clerk of Upshur County, West Virginia.