Flags v. Boston Five Bank          CV-90-340-B    10/30/93 P

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

Flags I, Inc., et al.

　　　v.                                  Civil No. 90-340-B

The Boston Five Cents
Savings Bank, et al.

**O R D E R**

This case concerns a failed effort by a lender and its borrowers to restructure their debt and equity interests in two related real estate development projects.  Financial problems with both projects prompted the parties to enter into complex negotiations that resulted in the lender's agreement to advance additional funds to several of the plaintiffs in exchange for plaintiffs' agreement to surrender ownership and control over one of the projects and to release certain potential claims against the lender and its affiliate.  When this agreement failed to stabilize relations among the parties, plaintiffs commenced this action alleging that the lender violated the bank anti-tying laws.

The lender and its affiliate argue that they are entitled to summary judgment with respect to plaintiffs' anti-tying claims because they claim that their conduct is protected by the "traditional banking practice" exemption from the bank anti-tying laws. For the reasons that follow, I accept defendants' arguments and grant their motion for summary judgment.

## I. FACTS

The real estate development projects that give rise to the present case are known as The Villages at Granite Hill I ("Granite Hill I") and The Villages at Granite Hill II ("Granite Hill II"). Both projects were intended to make substantial profits for the plaintiffs and their lender. However, like many such projects conceived during the 1980s, the projects have yet to be successful. The projects and the parties' unsuccessful restructuring effort are described below.

### A. Granite Hill I

Granite Hill I is a large complex of condominiums and single family homes in Hooksett, New Hampshire. The project was conceived in 1985 when several of the individual plaintiffs and their former partners agreed with the Boston Five Cents Savings

2

Bank, FSB ("Boston Five") to develop the first phase of Granite Hill I as a joint venture. Pursuant to this agreement, Boston Five incorporated Province Street Corporation ("Province Street") as a wholly owned service corporation, and several of the individual plaintiffs incorporated Flags I, Inc. ("Flags") to serve as equal partners in the project.

Shortly thereafter, Province Street and Flags executed a joint venture agreement ("Joint Venture Agreement") forming Granite Hill Associates ("GHA") to develop Granite Hill I. Flags contributed land valued at approximately $2 million and Province Street agreed to contribute an equivalent amount in cash as their initial capital contributions to GHA. Except for certain costs identified as "Hard Costs Overruns," the Agreement specified that additional capital contributions would be shared equally by Flags and Province Street. The Agreement also provided that the partners would receive periodic distributions from the project's net cash flow. Under the Agreement, Province Street was allowed to recover its initial capital contribution on a preferred basis and thereafter distributions would be shared equally. Finally, the Agreement provided that GHA would be overseen by a two-member management committee composed of one person selected by Flags and one person selected by Province Street.

3

Washington Development Company ("WDC"), a partnership comprised of several of the individual plaintiffs, was selected to manage Granite Hill I. After construction was well underway, the Villages at Granite Hill Realty, Inc. ("Granite Hill Realty") replaced the project's original real estate broker and Granite Hill Contractors-Hooksett, New Hampshire, Inc. ("Granite Hill Contractors") replaced the project's first general contractor. Both Granite Hill Realty and Granite Hill Contractors are owned by several of the individual plaintiffs.

Boston Five provided financing for Granite Hill I. As of March 1990, the outstanding balance on GHA's loans to Boston Five was $10,849,201.

B. Granite Hill II

Granite Hill II was intended to be a large development of condominiums and single family homes adjacent to Granite Hill I. The land for the project was purchased in 1986 and title is held in a trust ("the Granite Hill Trust"). Washington Development Company, Inc. ("WDI"), a corporation owned by several of the individual plaintiffs, and Province Street, were named as both trustees and equal beneficiaries in the Trust. Although substantial on-site and off-site improvements subsequently were completed, only two model homes were under construction by the

4

beginning of 1990.

Boston Five made several loans to the Granite Hill Trust to finance the purchase of the property, the completion of infrastructure improvements, and the construction of the model homes. As of March 1990, the Trust owed Boston Five $11,766,608 on these loans.

C. The Decline in the Real Estate Market

Granite Hill I initially appeared to be highly successful. It won construction and marketing awards and many units were built and sold. As a result, Province Street recovered its initial capital contribution and additional distributions totalling $2,734,761. Province Street also received $100,000 in cash and a note of $262,500 ("the Shops Note") from the sale of land by GHA to WDI for a commercial development known as the Shops at Granite Hill. Flags also recovered approximately $1,000,000 of its capital contribution to GHA. Finally, WDI earned management fees, Granite Hill Realty earned brokerage commissions, and Granite Hill Contractors earned income on its construction contracts with GHA.

When the New Hampshire Real Estate market experienced a sharp decline in 1988, both Granite Hill I and Granite Hill II began to experience financial difficulties. By 1989, sales at

5

Granite Hill I had slowed to the point that GHA needed additional capital contributions from Province Street to cover debt service and the cost of on-going operations. By the end of 1989, GHA owed approximately $335,000 to its contractors and its loans from Boston Five were in arrears. Granite Hill II was also experiencing similar difficulties. Although substantial infrastructure improvements had been completed and sales agreements for four units had been signed, only two model homes had been built. By the end of 1989, Boston Five's loans to the Granite Hill Trust were also in arrears.

D. <u>Restructuring Agreement</u>

In March 1990, the parties executed a complex agreement ("the Restructuring Agreement") substantially altering the parties' debt and equity interests in both projects. Several significant aspects of the Agreement are discussed below.

1. <u>Restructuring of GHA</u>

The Restructuring Agreement provided that GHA would be converted from a general partnership to a limited partnership. Whereas Flags and Province Street had each held a 50% general partnership interest in GHA under the Joint Venture Agreement, The Restructuring Agreement provided that Flags' interest in GHA was converted into a 49% limited partnership interest.

6

Similarly, Province Street's interest in GHA was to be converted into a 50% limited partnership interest and a 1% general partnership interest. The Restructuring Agreement also required Flags to release any claims against Boston Five or Province Street arising from a breach of any trust or fiduciary duty that Province Street might owe to Flags in the future because of Flags' new status as a limited partner in GHA. Thus, the Agreement vested Province Street with the power to act as if it were the sole owner of GHA, notwithstanding Flags' 49% limited partnership interest. The Restructuring Agreement further specified that Flags ultimately would share equally in any distributions or profits earned by GHA. However, the Agreement provided that the payment of any such profits or distributions would be deferred until the projected completion date for Granite Hill I.

### 2. Restructuring of Granite Hill Trust

The Restructuring Agreement specified that the equal beneficial interests held by Province Street and WDI in the Granite Hill Trust were to be converted into a limited partnership in which WDI would become the sole general partner with combined general and limited partnership interests of 99%. Province Street would retain only a 1% limited partnership

7

interest in the Trust. The Agreement also required Province Street to release any claim for breach of trust or fiduciary duty it might have against WDI so as to permit WDI to control the Trust as if it were the sole owner of the Trust assets.

        3.    <u>Releases of Claims Against Boston Five and</u>
             <u>Province Street</u>

An essential aspect of the Restructuring Agreement is its requirement that the parties release past and future claims against Boston Five and Province Street. In addition to the previously described releases purportedly negating any fiduciary duty Province Street might owe to Flags arising from Province Street's new role as the sole general partner in GHA, the Agreement also required Flags, WDI, WDC, Granite Hill Contractors, and Granite Hill Realty to release: (i) any claim "by or against Boston Five relating to Granite Hill I, Granite Hill II, or their course of dealing with respect thereto, whether or not arising as aforesaid"; and (ii) any claim "now existing or hereafter arising [against Province Street and Boston Five] based on any fiduciary or trust relationship . . . ." Thus, any claim that plaintiffs may have had to compel defendants to advance further funds to complete the development of Granite Hill II was to be released by the Restructuring Agreement.

8

### 4. Extension of Credit by Boston Five

As consideration for the benefits it received under the Restructuring Agreement, Boston Five agreed to loan additional funds to the plaintiffs and to modify the terms of several of its existing loans. Specifically, Boston Five agreed: (i) to make new loans of $434,381 (the "stabilization loan") and $137,074 ("the additional stabilization loan") to the individual plaintiffs; (ii) to modify the terms of the $262,500 Shops Note; (iii) to modify the terms of a loan of $252,000 from GHA to Flags which had been pledged to Boston Five to secure a loan of the same amount from Boston Five to GHA (collectively "the tax loan"); and (iv) to extend the terms of the Boston Five's loans to Granite Hill Trust by 24 months and defer the payment of interest on the loans until the notes became due.

### E. The Commencement of Litigation

The parties were unable to resolve their differences after executing the Restructuring Agreement. As a result, plaintiffs commenced this litigation in July 1990, shortly after Province Street took control of GHA and discharged Granite Hill Realty as the broker for Granite Hill I.

## II. **DISCUSSION**

Plaintiffs claim that the Restructuring Agreement violates the anti-tying provision of the Home Owners' Loan Act ("HOLA"), 12 U.S.C.A. § 1464(q)(1) (West Supp. 1993) ("§ 1464(q)(1)"),[1] which provides that:

> A savings association may not in any manner extend credit, lease, or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement--
>     (A) that the customer shall obtain additional credit, property, or service from such savings association, or from any service corporation or affiliate of such association, other than a loan, discount, deposit, or trust service;
>     (B) that the customer provide additional credit, property, or service to such association, or to any service corporation or affiliate of such association, other than those related to and usually provided in

---

[1]Plaintiffs have withdrawn a similar claim based upon the anti-tying provision of the Bank Holding Company Act Amendments of 1970, 12 U.S.C.A. § 1972 (West 1989). Further, to the extent that plaintiffs continue to argue that Province Street is liable for an anti-tying violation, I reject this argument and dismiss the anti-tying claim against Province Street pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Province Street is merely a service corporation. Accordingly, it cannot be liable for an anti-tying violation because only savings associations are subject to liability under § 1464(q)(1). Cf. BC Recreational Indus. v. First Nat'l. Bank, 639 F.2d 828, 831, n.7 (1st Cir. 1981) (reserving judgment on whether a subsidiary corporation of a bank can violate 12 U.S.C.A. § 1972 by acting as the bank's agent).

> connection with a similar loan, discount,
> deposit, or trust service; and
> 　　　(C) that the customer shall not obtain
> some other credit, property, or service from
> a competitor of such association, or from a
> competitor of any service corporation or
> affiliate of such association, other than a
> condition or requirement that such
> association shall reasonably impose in
> connection with credit transactions to assure
> the soundness of credit.

In claiming a violation of § 1464(q)(1), plaintiffs rely on subsection B of the statute and identify two types of property interests that the Restructuring Agreement required them to surrender in exchange for additional credit.[2] The first such

---

[2] Plaintiffs also argue that Boston Five violated § 1464(q)(1)(A) by requiring in the Restructuring Agreement that WDI assume most of Province Street's interest in the Granite Hill Trust. I reject this argument for two reasons. First, this aspect of the transaction was not compelled by Boston Five as a "condition or requirement" of the extension of further credit because Province Street was free to withdraw from the partnership without first obtaining WDI's permission. While Province Street may have subjected itself to liability by unilaterally withdrawing from the partnership, it is the release of that liability rather than the assumption of Province Street's interest in the trust that was compelled by the Restructuring Agreement. Second, WDI's assumption of a greater property interest in the Granite Hill Trust could not result in anti-tying damages because WDI thereby merely increased its control and beneficial interest in a valuable asset. It is instead the releases required by the Restructuring Agreement rather than the assumption of a greater property interest that may have resulted in anti-tying damages. Because such releases transfer property rights from plaintiffs to Boston Five and Province Street, this claim is more appropriately considered under § 1464(q)(1)(B).

11

property interest is Flags' general partnership interest in GHA, which was converted into a limited partnership interest by the Restructuring Agreement. The second property interest consists of the past and future claims against Boston Five and Province Street which Flags, WDI, WDC, Granite Hill Realty, and Granite Hill Trust, were required to release in the Agreement. Plaintiffs contend that both aspects of the Agreement violate § 1464(q)(1) because the Agreement conditioned the extension of additional credit to the plaintiffs upon their relinquishment of these valuable property interests.[3]

Boston Five argues that it is not liable under § 1464(q)(1) because the bargain it struck with the plaintiffs was a "traditional banking practice" which is exempt from liability under § 1464(q)(1). Plaintiffs respond by contending that a banking practice cannot be traditional and, therefore, exempt from § 1464(q)(1), unless the specific practice at issue is rooted in tradition and widely practiced in the banking industry.

_____

[3] Plaintiffs do not contend that either the Joint Venture Agreement or the agreement creating the Granite Hill Trust violated § 1464(q)(1) by requiring plaintiffs to surrender equity in Granite Hill I and II in exchange for the credit needed to develop the projects. Rather, it is the adjustments to these interests in the Restructuring Agreement which form the basis for plaintiffs' anti-tying claim.

Because the Restructuring Agreement affected Boston Five in its capacity as a joint venture partner, plaintiffs argue that the Agreement cannot be considered traditional unless such joint ventures are themselves traditional. Accordingly, they oppose summary judgment by relying on expert testimony that lenders have not traditionally and do not commonly engage in joint ventures with their customers. In evaluating this argument, I first determine the limits of the traditional banking practice exemption by considering the language of § 1464(q)(1), its legislative history, and several decisions interpreting the bank anti-tying laws. I then apply the exemption to the facts of this case.[4]

---

[4] I use the following standard of review in assessing defendants' motion: summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A "genuine" issue is one "that properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); accord Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990). A "material issue" is one that "might affect the outcome of the suit . . . ." Anderson, 477 U.S. at 248. The burden is upon the moving party to aver the lack of a genuine, material factual issue, Finn v. Consol. Rail Corp., 782 F.2d 13, 15 (1st Cir. 1986), and the court must view the record in the light most favorable to the non-movant, according the non-movant all beneficial inferences

13

A. The Traditional Banking Practice Exemption

It is axiomatic that the process of statutory construction begins with an examination of the text. Ardestani v. INS, 112 S. Ct. 515, 519 (1991). Meaning, however, will rarely be found by examining isolated statutory phrases. Instead, "[i]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." Kelly v. Robinson, 479 U.S. 36, 43 (1986) (quoting Offshore Logistics, Inc. v. Tallentire, 477 U.S. 207, 221 (1986) (in turn quoting Mastro Plastics Corp. v. NLRB, 350 U.S. 270, 285 (1956) (in turn quoting United States v. Heirs of Boisdore, 8 How. 113, 122 (1849)))). Moreover, where statutory terms are ambiguous when considered in context, it is appropriate to turn to clearly expressed statements of purpose in a statute's legislative history for direction. See Ardestani, 112 S. Ct. at 520. Thus, in construing the statute at issue in the present case, I first consider the text of the specific exemption upon which Boston Five relies in the context of the

_____

discernable from the evidence. Oliver v. Digital Equip. Corp., 846 F.2d 103, 105 (1st Cir. 1988). If a motion for summary judgment is properly supported, the burden shifts to the non-movant to show that a triable issue exists. Donovan v. Agnew, 712 F.2d 1509, 1516 (1st Cir. 1983).

14

statute as a whole.  I will turn to other potential sources of meaning only if the language of the statute is ambiguous.

1.  The Text

Section 1464(q)(1) prohibits certain tying, reciprocal dealing, and exclusive dealing arrangements.  The restrictions on each type of arrangement are described in separate subsections, and each subsection has its own exemption.  Subsection A exempts tying arrangements involving only a "loan, discount, deposit, or trust service."  Subsection B exempts reciprocal dealing arrangements that are "related to and usually provided in connection with a similar loan . . . ."  Finally, Subsection C exempts exclusive dealing arrangements that are "reasonably impose[d] in connection with credit transactions to assure the soundness of credit."  These three exemptions collectively provide the textual basis for the traditional banking practice exemption.  Since plaintiffs allege a violation of Subsection B, Boston Five's traditional banking practice claim must be evaluated under the exception for reciprocal arrangements that are "related to and usually provided in connection with a similar loan . . . ."

Plaintiffs plausibly suggest that a reciprocal dealing arrangement is exempt from the bank anti-tying laws only if the

15

property interest at issue is identical to other such interests that lenders traditionally and commonly require borrowers to surrender in exchange for additional credit.[5] Another, equally plausible interpretation of the exemption, however, looks to the general nature of the property interest transferred in exchange for additional credit. Under this interpretation, a property interest would be "related to and usually provided in connection with a similar loan" if a similarly situated lender would normally require its borrowers to surrender a property interest of that general type in exchange for the additional credit. Since the text of the exemption does not unambiguously require either interpretation, I turn to the statute's legislative history and other judicial interpretations of the exemption to determine which of these potential meanings more closely serves the statute's overall object and policy.

2.  Legislative History

Section 1464(q)(1) was enacted as part of The Thrift Institutions Restructuring Act of 1982 ("TIRA"). See H.R. 6267, 97th Cong., 2d Sess., 96 Stat. 1469, 1503 (1982). It is derived

_____

[5] Neither side attempts to support its position by arguing from the text of § 1464(q)(1). Thus, I infer plaintiffs' interpretation of the text from their other arguments.

16

from an anti-tying provision added in 1970 as an amendment to the Bank Holding Company Act ("BHCA"). See H.R. 6778, 91st Cong., 2nd Sess., 84 Stat. 1760, 1766-67 (1970). Prior to the adoption of TIRA, savings institutions were subject to BHCA's anti-tying provision. See 12 U.S.C.A. § 1841(C) (West 1980) (amended 1982) (defining "bank" as used in BHCA's anti-tying provision to include savings associations). TIRA removed savings associations from coverage under BHCA and adopted an almost identical anti-tying provision for savings associations in § 1464(q)(1). See H.R. 6267, 97th Cong., 2d Sess., 96 Stat. 469, 1503-04 (1982). As TIRA's legislative history demonstrates, the similarity between TIRA's anti-tying provision and BHCA's anti-tying provision was not coincidental. See S. REP. No. 536, 97th Cong., 2d Sess., 13 reprinted in 1982 U.S.C.C.A.N. 3054, 3109 ("[t]his provision applies the anti-tying restrictions to Federal thrifts in a manner generally comparable to the anti-tie-in provision applicable to bank holding companies under the Bank Holding Company Act of 1956, as amended"). Thus, courts construing § 1464(q)(1) have generally treated it as equivalent to BHCA's anti-tying provision. Integron Life Ins. Corp. v. Browning, 989 F.2d 1143, 1550 (11th Cir. 1993); Bruce v. First Fed. Sav. & Loan Ass'n of Conroe, 837 F.2d 712, 716 (5th Cir. 1988); Tri-Crown,

17

Inc. v. American Fed. Sav. & Loan Ass'n, 908 F.2d 578, 582 (10th Cir. 1990).

BHCA's anti-tying provision was added as a Senate Committee amendment to the bill that became the 1970 Amendments to the BHCA. H.R. CONF. REP. No. 1747, 91st Cong., 2d Sess., reprinted in 1970 U.S.C.C.A.N. 5561, 5579. The purpose of the provision, like its antitrust antecedents, was "to prohibit anti-competitive practices which require bank customers to accept or provide some other service or product or refrain from dealing with other parties in order to obtain the bank product or service they desire." S. REP. No. 1084, 91st Cong., 2d Sess., reprinted in 1970 U.S.C.C.A.N. 5519, 5535;[6] see also, B.C. Recreational, 639 F.2d at 831. However, unlike the antitrust laws, which also apply to credit tying arrangements, the proposed anti-tying amendment broadly proscribed tying, reciprocal dealing, and exclusive dealing arrangements without requiring proof of economic power or a significant effect on commerce. S. REP. No. 1084, 91st Cong., 2d Sess., reprinted in 1970 U.S.C.C.A.N. 5519, 5558 (supplementary views of Senator Brooke); see also, Integron,

---

[6] The Senate report describing TIRA's anti-tying provision contains a similar expression of purpose. S. REP. No. 536, 97th Cong., 2d Sess., reprinted in 1982 U.S.C.C.A.N. 3054, 3071.

18

989 F.2d at 1150; <u>Costner v. Blount Nat'l. Bank of Maryville</u>, 578 F.2d 1192, 1196 (6th Cir. 1978).  As a result, substantial concern was expressed that the amendment might prohibit many established banking practices that had no adverse effect on competition.  S. REP. No. 1084, 91st Cong., 2d Sess., <u>reprinted in</u> 1970 U.S.C.C.A.N. 5519, 5546-49 (supplementary views of Messrs. Bennett, Tower, Percy and Packwood).

In an effort to address these concerns, the authors of the amendment proposed that the Federal Reserve Board be given the power to create exemptions consistent with the statute's overall purpose.  <u>Id.</u> at 5535.  This proposal did not provide enough protection to the banking industry for Committee members Bennett, Tower, Percy, and Packwood, however, who noted in supplementary views that "[a]n amendment is in order to show that the purpose of this section is to prohibit only those tying arrangements whose effect may be to lessen competition or tend to create monopoly in any type of credit or property transactions or in any type of services and which is engaged in by a bank, a bank holding company, or any subsidiary of a bank holding company."  <u>Id.</u> at 5542-48 (supplementary views of Messrs. Bennett, Tower, Percy and Packwood).

19

In a floor amendment several months later, these same senators attempted to address the weakness they perceived in the bill. However, rather than including a statement of purpose to guide the Federal Reserve Board in developing exemptions, their amendment added the three specific exemptions which we now know collectively as the traditional banking practice exemption. See CONG. REC. S32,125 (Sept. 16, 1990). The exemptions were later included in substantially the same form in TIRA.

In summary, the legislative history of § 1464(q)(1) and its predecessor, 12 U.S.C. § 1972, demonstrate that the bank anti-tying laws were intended to deter lenders from engaging in anti-competitive practices. Moreover, the three exemptions which are now known collectively as the traditional banking practice exemption were intended to be construed to permit legitimate banking practices that have no anti-competitive effect. Finally, while the language of each of the three exemptions differs in small respects to account for the nature of the arrangement to which each exemption applies, there is no suggestion in the legislative history that Congress intended different standards to apply to the three exemptions. To the contrary, this history establishes that the three exemptions were enacted at the same time to achieve the same result.

### 3. Judicial Interpretation

The appellate courts that have addressed this issue have construed the statute consistently with its legislative history to prohibit only anti-competitive practices. In B.C. Recreational, a borrower challenged its lender's requirement that the borrower surrender management control of its business to a person designated by the lender in exchange for additional credit. In rejecting the borrower's argument that the arrangement violated the reciprocal dealing restrictions of BHCA's anti-tying provision, the First Circuit Court of Appeals first held that the lender's requirement was not a true reciprocal dealing arrangement because the person the lender had placed in charge of the borrower's business had no financial ties to the lender and thus no "additional credit, property, or service" was provided to the lender in exchange for the additional credit. Id. at 832. Alternatively, the court held that "the arrangement complained of falls within the range of appropriate traditional banking practices permissible under the Act." Id. In reaching this conclusion, the court did not examine the text of the specific exemption created for reciprocal dealing arrangements. Nor did it discuss whether the arrangement at issue was common in the banking industry. Instead, the court

21

looked broadly to the effect of the arrangement.  Because it determined that it protected the bank's interest in its investment, the court concluded that the arrangement came within the scope of the traditional banking practice exemption.  Id.  Thus, the court summarized the basis for its ruling by stating that "the pleadings do not admit of a claim that the actions of the Bank or FNB [the Bank's affiliate] were intended to or resulted in the lessening of competition or encouragement of unfair competitive practices . . . ."  Id.

The Eleventh Circuit Court of Appeals also broadly interpreted the traditional banking practice exemption in Parsons Steel v. First Alabama Bank of Montgomery, 679 F.2d 242 (1982).  There, a lender had conditioned additional credit upon the borrower's agreement to change corporate management and majority stock ownership.  A trial was held on the lender's anti-tying claim and the jury returned a verdict for the borrower.  In challenging the district court's award of judgment N.O.V. to the lender, the borrower argued that the arrangement at issue was not a traditional banking practice because the jury had found that it was "unusual" for a bank to require a borrower to change its management and ownership in exchange for additional credit.  The Court of Appeals rejected this contention because it concluded

22

that the borrower had proposed an overly narrow definition of the traditional banking practice exemption. Instead, the court interpreted the exemption in light of the legislative purpose of the anti-tying provision and concluded that "[u]nless the 'unusual' banking practice is shown to be an anti-competitive tying arrangement which benefits the bank, it does not fall within the scope of the Act's prohibitions." Id. at 245. Applying this standard, the court affirmed the district court's decision because "there [was] no evidence that the bank would benefit in any way other than by getting additional protection for its investment." Id. at 246.

Finally, in Tose v. First Pennsylvania Bank, 648 F.2d 879 (1981), the Third Circuit Court of Appeals also broadly construed the exemption in rejecting a borrower's argument that an agreement tying additional credit to the borrower's relinquishment of control over his business violated the bank anti-tying laws. Here, the court observed that:

> Imposition of financial controls over the Eagles [the security for the bank's prior loans] was directly related to maintaining the security of [the bank's] substantial investment, and the bank's demand cannot be considered unusual in the face of substantial evidence that it had good reasons to be concerned about the loan. As the district court held in Sterling Coal Co., Inc. v.

23

> United American Bank in Knoxville, 470 F.
> Supp. 964, 965 (E.D. Tenn. 1979), "[t]he Act
> does not prohibit attempts by banks to
> protect their investments."

Id. at 897; see also RAE v. Union Bank, 725 F.2d 478, 480 (9th Cir. 1984) (a complaint merely alleging that the extension of credit was tied to various provisions designed to protect the bank's security does not state a bank anti-tying claim); cf. Bruce, 837 F.2d at 718 (declining to dismiss a bank anti-tying claim simply because the complaint does not allege that the tying arrangement was anti-competitive). Thus, all of the circuit courts that have construed the traditional banking practice exemption have concluded that the exemption should be construed broadly in light of the purpose that the bank anti-tying laws were designed to achieve.

4. Analysis

As I have already noted, the bank anti-tying laws were intended to prohibit anti-competitive tying, reciprocal dealing, and exclusive dealing arrangements without requiring proof of market power and a substantial effect on commerce. However, while Congress intended to prohibit anti-competitive banking practices when it enacted the anti-tying laws, it was equally concerned that exemptions were needed to allow banks and savings

24

associations to continue to engage in lending practices that have no adverse effect on competition. As a result, the three specific exemptions now collectively known as the traditional banking practice exemption were added as an amendment to address this concern.

If, as plaintiffs suggest, the reciprocal dealing exemption applies only in cases where lenders commonly and traditionally require borrowers to surrender the specific property interest at issue in exchange for additional credit, the bank anti-tying laws would be over-inclusive -- they would preclude many newly established banking practices which serve legitimate banking interests without adversely affecting competition. This narrow reading of the exemption would be devastating to both borrowers and lenders, particularly in the loan workout context where the creativity of the participants is routinely tested by the borrower's need for additional credit and the lender's desire to protect an already endangered investment.

A reading of the exemption that focuses on the general nature of the reciprocal dealing arrangement at issue rather than the specific property interest transferred in exchange for additional credit is preferable to plaintiffs' more narrow reading for several reasons. First, it construes the reciprocal

25

dealing exemption harmoniously with the other two components of the traditional banking practice exemption which focus on the nature and effect of the transaction at issue rather than whether a particular practice was traditional in the banking industry. Compare 12 U.S.C. § 1464(q)(1)(B) with 12 U.S.C. § 1464(q)(1)(A) (exempting all tying arrangements involving a "loan, discount, deposit, or trust service") and 12 U.S.C. § 1464(q)(1)(C) (exempting all exclusive dealing arrangements that are "reasonably impose[d] in connection with credit transactions to assure the soundness of credit"). Second, this interpretation more closely serves the clearly expressed legislative purpose that the anti-tying laws should prohibit only anti-competitive banking practices. Finally, it is consistent with the broad reading of the exemption which I believe is mandated by the First Circuit's opinion in B.C. Recreational and the other circuit courts that have addressed the issue. Thus, I conclude that a reciprocal dealing arrangement will be protected under the traditional banking practice exemption if a similarly situated lender would normally require its borrowers to surrender a similar type of property interest in exchange for additional

26

credit.[7]

With this definition of the exemption in mind, I now consider whether this issue is capable of being resolved on a motion for summary judgment.

B. <u>Application</u>

Plaintiffs oppose defendants' motion for summary judgment primarily by relying on testimony to be provided by their expert witness, Robert Wheeler. Wheeler has the following to say on the subject of joint ventures involving banks and real estate developers:

> There appears to have been little involvement in real estate joint ventures by Massachusetts or New Hampshire banking institutions prior to 1984 or 1985. . . . In part to avoid usury problems, however, some banks did in fact take equity positions in real estate developments during the mid-1980's. However, these positions were relatively few in number . . . . By the end of 1987 or early 1988, the real estate market had begun to soften and few, if any, were begun after that time. I would thus characterize the real estate joint venture as a flash in the pan, and certainly not characteristic of traditional banking

---

[7] While this broad reading of the exemption may well shield many ill-advised or even tortious reciprocal dealing arrangements from claims under the anti-tying laws, a plaintiff remains free to challenge such arrangements by relying on some other legal theory.

practice . . . ."

Letter from Robert N. Wheeler to Jamie N. Hage dated April 2, 1992. According to plaintiffs, this testimony gives rise to a genuine factual dispute concerning the material issue of whether the Restructuring Agreement's reciprocal dealing provisions qualify as traditional banking practices. Plaintiffs contend that this is so because Wheeler's testimony demonstrates that the Agreement alters the parties' interests in existing arrangements which are not themselves traditional in the banking industry. Although I accept for purposes of argument plaintiffs' contention that a genuine dispute exists as to whether lenders have traditionally involved themselves in joint ventures with their borrowers, I reject their contention that this dispute is material to the outcome of this case.

As I have already determined, a reciprocal dealing arrangement may qualify as a traditional banking practice even if lenders do not ordinarily require their borrowers to transfer the specific property interest at issue in exchange for additional credit. Instead, even a novel reciprocal dealing arrangement may be entitled to protection under the exemption if a similarly situated lender would commonly require arrangements of that general type to protect its interest in the security it holds for

28

a troubled loan.  At most, Wheeler's testimony establishes that banks and savings institutions such as Boston Five did not routinely engage in joint venture agreements with their borrowers.  The testimony has no bearing on the issue of whether the control Flags was required to surrender in GHA and the releases the plaintiffs were required to provide are of a general type that borrowers are routinely required to surrender in a loan workout context in order to obtain additional credit.  Because plaintiffs' evidence fails to demonstrate that a triable issue exists on this question, they cannot successfully resist defendants' motion for summary judgment.

Although Plaintiffs correctly allege that the Restructuring Agreement required them to transfer a portion of Flags' interest in GHA to Province Street, the only effect of that portion of the agreement was to allow Boston Five, through Province Street, to insure that GHA was managed so as to maximize Boston Five's chances of recovering on its delinquent loans.  Flags retained its right to share equally in any profits that GHA might generate in the future under the Restructuring Agreement.[8]  Thus, the only

---

[8] The fact that the Restructuring Agreement required Flags to postpone its right to profits until the end of the project is so common in the loan workout context that this aspect of the

29

thing it lost by surrendering its property interest in GHA was control over GHA's management. This aspect of the Agreement is indistinguishable from other cases, including B.C. Recreational, in which a lender's demand that its borrower surrender control of a project to a third party in exchange for additional credit was found to be a traditional banking practice. See, e.g., B.C. Recreational, 639 F.2d at 832; see also, e.g., Parsons Steel, 679 F.2d at 246; Tose, 648 F.2d at 897; see also Dennis v. First National Bank of Westville, 868 F.2d 206, 209 (7th Cir.), cert. denied, 493 U.S. 816 (1989) (requirement that borrower agree to sell business in exchange for additional credit is a traditional banking practice).

Although it might be argued that B.C. Recreational is distinguishable from the present case because there the controlling party had no financial ties to the lender, whereas here Province Street is owned by Boston Five, I do not find this distinction to be meaningful. In B.C. Recreational, the court reached the traditional banking practice issue even though it also concluded that the claims should be dismissed for the alternative reason that the absence of financial ties between the

agreement is not even addressed by the plaintiffs in their memoranda opposing summary judgment.

30

lender and the third party placed in charge of the business precluded any argument that a tying arrangement even existed. B.C. Recreational, 639 F.2d at 832. The court's willingness to consider the traditional banking practice issue under these circumstances strongly suggests that the existence of financial ties between the lender and the entity placed in control of the business is irrelevant to the issue of whether an agreement to surrender control of a business qualifies under the exemption as a traditional banking practice.

Plaintiffs have also failed to demonstrate that a triable issue exists with respect to defendants' claim that the releases required under the Restructuring Agreement qualify as a traditional banking practice. Defendants have produced substantial unrebutted evidence that similarly situated lenders almost always require releases when negotiating agreements to provide additional credit to delinquent lenders. Such releases have the effect of allowing lenders to advance additional sums on troubled loans while at the same time protecting their existing security for the loans. Moreover, it is entirely consistent with the purpose of the bank anti-tying laws for a lender to require such releases because they are devoid of anti-competitive effect. Finally, a release does not become nontraditional merely because

31

it limits potential claims that may exist against the lender and its affiliate in their alleged capacities as both lender and equity partner. No reasonable lender would advance additional funds to a borrower unless the borrower is willing to set aside all potential claims that may arise from the relations between the parties concerning the development loans.

In summary, the unrebutted evidence in this case establishes that Boston Five entered into the Restructuring Agreement to protect its investment in Granite Hill I and Granite Hill II.[9] By requiring Flags to surrender control of GHA, and by requiring plaintiffs to release any potential claims against Boston Five and its affiliate in exchange for additional credit, Boston Five was merely imposing requirements that were "related to and usually provided in connection with a similar loan." As such, their actions are exempt from § 1464(q)(1) and they are entitled to summary judgment with respect to plaintiffs' anti-tying

---

[9]Plaintiffs argue that Boston Five conceived of the Restructuring Agreement in an effort to replace Flags and WDI as the developer for Granite Hill I and Granite Hill II. I find no support for this argument in the record, even when the record is construed in the light most favorable to plaintiffs.

claim.[10]

### III. CONCLUSION

For the reasons described herein, plaintiffs' anti-tying claim against Province Street is dismissed for failure to state a claim. Summary judgment is awarded to Boston Five with respect to Count I of the Complaint. Accordingly, Defendants' Motion for Summary Judgment (document no. 85) is granted.

SO ORDERED.

_____
Paul Barbadoro
United States District Judge

September 30, 1993

cc:    Jamie N. Hage, Esq.
      Robert Ketchand, Esq.
      Bruce Topman, Esq.
      Donald Elliott, Esq.
      James Muirhead, Esq.
      Thomas Richards, Esq.

---

[10]In light of my ruling on this issue, it is not necessary to address the remaining arguments defendants make in support of their motion for summary judgment.