FREIDCO OF WILMINGTON, DELA-WARE, LTD., a Texas limited partnership Debtor–In–Possession under Chapter XII of the Bankruptcy Act of the United States, and Unit, Inc., a Texas corporation, Debtor–In–Possession under Chapter XI of the Bankruptcy Act of the United States, Plaintiffs,

v.

The FARMERS BANK OF the STATE OF DELAWARE, Defendant.

Civ. A. No. 76–149.

United States District Court,
D. Delaware.

Oct. 1, 1980.

Sherman E. Unger and Michael G. Kohn, Cincinnati, Ohio, for plaintiff Unit.

Max S. Bell, Jr. and Robert J. Katzenstein of Richards, Layton & Finger, Wilmington, Del., for defendant Farmers.

Peter J. Walsh of Murdoch & Walsh, Wilmington, Del., Trustee and F. Alton Tybout of Tybout, Redfearn, Casarino & Pell, Wilmington, Del., for Trustee of Freidco.

Thomas G. Hughes of O'Donnell & Hughes, Wilmington, Del., for FDIC.

## OPINION

STAPLETON, District Judge:

Plaintiffs Freidco of Wilmington, Delaware, Ltd. ("Freidco–Wilmington"), and

Unit, Inc., ("Unit") bring this action under the anti–tying provision of the Bank Holding Company Act. 12 U.S.C. § 1972. They seek treble damages from the Farmers Bank of the State of Delaware ("Farmers"). 12 U.S.C. § 1975. This Opinion constitutes the Court's findings of fact and conclusions of law after a trial on plaintiffs' Bank Holding Company Act claims.[1]

In 1964, Farmers was entertaining the idea of constructing an office building to house the bank. To accomplish this, Farmers had acquired a tract of land at 10th and Market Streets in Wilmington. A determination had been made that the bank should not own the building itself, but should be a tenant in any building which would be constructed.

At that time, Robert E. Hickman ("Hickman"), President of Emmett S. Hickman Company, a Wilmington real estate firm, was a director of Farmers Bank. Hickman had assisted a consulting company which had been retained by Farmers to make recommendations regarding the proposed building, so Farmers' chairman asked him whether he could locate a developer to construct the building. Hickman ultimately discussed the bank's plan with B. W. Morris ("Morris"), Unit's President.

The transaction, as initially related to Morris by Hickman, required the prospective developer to purchase the tract of land from the bank, construct a building on that land, and lease a certain portion of the space to Farmers. As part of the transaction, Emmett S. Hickman Company was to receive a commission of $50,000.00. In addition, the developer was to appoint Emmett S. Hickman Company as leasing and managing agent for the building.

A partnership called Freidco, consisting of Unit, and G. P. Aenchbacher, was formed for the purpose of constructing and operating the office building. Freidco then entered into commission and leasing agreements with Emmett S. Hickman Company and entered into a management agreement with Building Management Corporation, another Hickman company.

On May 14, 1965, Farmers deeded the land to Freidco. Farmers also entered into the following agreements with Freidco:

(a) Lease between Freidco, as landlord, and Farmers, as tenant, for seven floors of the to–be–constructed office building.

(b) An Option Agreement giving Farmers the option to purchase the to–be–constructed office building upon certain terms and conditions.

(c) A Cash Flow Agreement that Farmers, so long as it was not in default of its lease obligations, shall have the right to participate in the cash flow of the to–be–constructed building following the 126th month [April 1, 1977] of the initial term of the lease with Freidco.

(d) A five year Sublease, with option in Farmers to extend the term, between Farmers as sublessor, and Freidco, as sublessee, commencing on the same date as the prime lease and covering portions of Farmers' leased space in the building.

Thus, Freidco, the lessor to Farmers, became a sublessee for certain floor space, and eventually, a sublessor for that space.

Farmers and Chase Manhattan provided part of the construction financing and the General Electric Pension Trust agreed to provide permanent financing. At the same time that Freidco closed with Farmers, Freidco executed various financing documents with the General Electric Pension Trust:

(a) Building Loan Agreement.

(b) Mortgage from Freidco to the General Electric Pension Trust in the principal amount of $7,300,000.00.

(c) Mortgage Note from Freidco to the General Electric Pension Trust in the principal amount of $7,300,000.00.

(d) Assignment of Freidco's Lease with Farmers to the General Electric Pension Trust.

Freidco subsequently deeded the land to the General Electric Pension Trust and leased it

---

1. The numerous other claims between the parties were severed for subsequent disposition.

back from the Trust on a long term ground lease.

On August 10, 1966, Freidco–Wilmington, a Texas limited partnership, was formed for the purpose of owning and operating the office building. The general partners of Freidco–Wilmington were Unit and Aenchbacher. Hickman and Harry B. Tingle ("Tingle"), a business associate of Hickman in Emmett S. Hickman Company, became limited partners in exchange for a contribution of $250.00 cash from each of them, cancellation of the management and leasing agreements, and an agreement on the part of Hickman and Tingle to assume, in perpetuity, the responsibility for managing and leasing the property. Hickman and Tingle agreed that their only compensation would be their respective shares of the cash flow from the building.

Hickman and Tingle reached an agreement between themselves that they would employ Emmett S. Hickman Company to perform the leasing and management services on their behalf. Hickman and Tingle paid for these services out of their own pockets. Later, they took the position that the obligation to make such payments was contingent upon their receiving cash flow from the building.

Prior to the completion of the building, Unit proposed to Farmers that an additional $750,000.00 be borrowed through an increase in the permanent financing from the General Electric Pension Trust. Of the total amount, $250,000.00 was specifically allocated for improvements to Farmers' space. The remainder was ostensibly for use by Freidco–Wilmington.[2] To effectuate this plan a second closing was held on March 29, 1967. Under the provisions of the financing arrangement, Farmers' base rent for its space was equal to the debt service on the permanent financing. Farmers' base rent was paid directly to the Trust. Accordingly, when the permanent mortgage was increased by the sum of $750,000.00, Farmers' lease with Freidco was amended to provide for an increase in

the base rent equivalent to the increase in the debt service on that amount. At the same time, Freidco's sublease with Farmers was amended to increase the rent paid by Freidco thereunder in an amount equal to the debt service on the remaining $500,-000.00. Farmers then paid the entire increase in debt service but was to be reimbursed for Freidco's share through "additional rent".

Although Freidco–Wilmington had been formed by this time, record title was never transferred to it by Freidco. About that time, the City of Wilmington passed a real estate transfer tax. Because the partners were unwilling to pay the substantial sum required to effect this paper transaction, record title was left in Freidco. The bank account and all of the leases also remained in Freidco's name.

During these early years the relationship among the parties was warm and informal and the parties reposed confidence in one another. Unit, with the aid of Hickman, Tingle and Farmers, sought to develop other properties in Wilmington. In late 1966, it came to the attention of Unit that the old Wilmington High School property on Delaware Avenue was available. The transaction was to be structured in the form of a joint venture. However, Farmers insisted that Unit borrow the funds for the purchase of the land in its own name because of the usury statutes. Accordingly, Unit borrowed $700,000.00 from Farmers on December 16, 1976, executing a note and a corporation bond and warrant in favor of the bank. The property was purchased and held for the benefit of the venture to be formed. On September 21, 1967 a formal joint venture agreement was executed by Unit, Hickman and Marvin Lewis, with Unit holding a 77 and ½ percent undivided interest in the property, Hickman an undivided 20 percent interest and Lewis an undivided 2 and ½ percent interest. Emmett S. Hickman Company was commissioned to manage 800 Delaware Avenue, although no written agreement for the payment of fees

---

**2.** I am not persuaded by the current record that this $500,000.00 was in fact invested by Unit in

improvements to the Farmers Bank Building for the benefit of Freidco–Wilmington.

was executed. Payments were made for these services in the 1968 to 1971 period. Aenchbacher withdrew from both Freidco and Freidco–Wilmington in 1967.

In extending the $700,000.00 loan to Unit for the benefit of 800 Delaware Avenue Associates, Farmers anticipated no reduction in principal for a period of at least one year. The interest payments were made on a monthly basis, but no amortization of principal was made. On or about February 27, 1969, a permanent mortgage was placed on the constructed building ("the IBM Building") and, the principal amount of the loan was reduced by a payment of $250,-000.00 from funds made available at the closing.

On October 16, 1967, Unit commenced the development of a third office building in Wilmington when it entered into a partnership agreement for the development of 300 Delaware Avenue ("Bank of Delaware Building"). That partnership included as limited partners, *inter alia*, Hickman and Tingle. In late 1970, it became necessary to borrow an additional sum of money to complete the project and $150,000.00 was borrowed from Farmers. To secure this obligation, Unit, Freidco and Freidco–Wilmington assigned to Farmers the leases and rents derived from the Farmers Bank Building (except for Farmers' lease from Freidco). All of Freidco–Wilmington's partners consented to this assignment.

On or about October 20, 1971, 300 Delaware Avenue Associates, through Unit, paid back the $150,000.00 loan that Farmers had advanced for the closing on the Bank of Delaware Building. Farmers returned the note to Unit stamped "Satisfied of Record." Farmers also returned the *original* of the recorded assignment of leases and rentals. However, Farmers did not cause the assignment to be stamped satisfied of record because Farmers' counsel advised that such an act was "not necessary due to the fact that this automatically ceases with the satisfaction of the $150,000." Unit relied upon this representation and did not pursue the matter until Farmers, in 1974, indicated that it was prepared to use the assignment to seize the rents from the Farmers Bank Building.

In May of 1971, Farmers decided that it would be more profitable to terminate its sublease with Freidco and to rent the sub–subleased portions of the building itself. It gave notice of this decision to Freidco on June 28, 1971 and the sublease terminated in accordance with its original terms on June 30, 1972.

On October 29, 1971 Farmers announced the acquisition of Emmett S. Hickman Company, changing its name to Hickman and Company. At the same time, Hickman was appointed Senior Vice President of Farmers.

On June 23, 1972, Unit borrowed $20,-000.00 from Farmers and executed a note in favor of the bank, payable in thirty days. Although Unit continued to pay interest on that note, no payments in reduction of the principal were made.

During 1973 and January of 1974, Farmers and Morris attempted, without success, to negotiate a sale of Freidco–Wilmington's interest in the Farmers Bank Building to Farmers. This period marked the beginning of the substantial disputes between Unit and Farmers regarding the Farmers Bank Building and 800 Delaware Avenue.

By letter dated February 13, 1974, Daniel M. Kristol, an attorney for Unit, Inc., requested Farmers to cancel of record the assignment of leases. By letter dated February 26, 1974, Farmers replied that it had the authority to retain the assignment because of a $20,000.00 collateral note dated June 23, 1972, because that assignment applied to that $20,000.00 note of that date and all other notes and/or obligations of Unit. The note to which Wales referred was executed more than six months after Farmers had advised Unit that the Assignment automatically ceased.

By letter dated February 25, 1974, Hickman and Company wrote to Unit that Hickman and Company was concerned that it had not been paid for services provided at 800 Delaware Avenue, since November 1, 1971, the first month after it was acquired by Farmers. On March 19, 1974, Hickman

and Company informed Unit by telegram that unless Hickman and Company was paid earned management and leasing fees of $24,533.94 by April 1, 1974, and satisfactory arrangements made to keep that fee on a current basis, it would discontinue its management of 800 Delaware Avenue effective April 30, 1974.

The very next day, by telegram, Farmers demanded payment in full of the $450,000.00 balance on the December 16, 1966 bond and mortgage on the Delaware Avenue parking lot and the $20,000.00 demand note dated June 25, 1972, together with accrued interest on each debt. The bank stated that if payment was not received or arrangements satisfactory to the bank were not made on or before April 1, 1974 foreclosure proceedings would be initiated on the Delaware Avenue parking lot property (802 Delaware Avenue). In the course of trying to collect this indebtedness H. Whitwell Wales, Jr. ("Wales"), Farmers' Executive Vice President, told Morris that Farmers was prepared to seize the rent from the Farmers Bank Building pursuant to the assignment of leases which had been the subject of the February correspondence between Farmers and Unit.

On March 20, 1974, Unit, on behalf of 800 Delaware Avenue Associates, responded to Connor's telegram, and the next day, Unit, again on behalf of 800 Delaware Avenue Associates, responded to Farmers with a request that any action by Farmers be postponed until the return of Morris, who was then out of the country. Farmers ultimately extended its deadline until April 15, 1974. By telegram dated April 10, 1974, Hickman and Company advised Unit that it would manage the property to at least May 13, 1974.

By a letter dated April 12, 1974, Unit enclosed an analysis of how it proposed to pay back a loan in the amount of $1,200,000.00 over a seven year period from cash flow of both the Farmers Bank Building and the First National Bank Building, Las Vegas.

By letter to Unit dated April 16, 1974, Farmers stated that Unit's proposal was not satisfactory to Farmers and the demands were stated as follows:

1. Unit, Inc., as general partner of Freidco of Wilmington, Delaware, Ltd., authorizes Hickman and Company, its managing agent for the Farmers Bank Building, to continue to make deposits of all rentals received by it into Freidco's account # 0302 028 5 and will advise the Bank as these deposits are made.

2. Unit, Inc. authorizes Farmers Bank to charge this account $10,000 per month as rental payments are credited to the above-mentioned account. Farmers Bank may make one or more charges at its discretion up to $10,000 total against any month's rent rolls.

3. These monthly payments of $10,000 would be applied, at least initially, as follows: $2,000 per month on the indebtedness to Hickman and Company currently of $24,533.94 for management and leasing fees related to the building at 800 Delaware Avenue; and $8,000 per month ($10,000 per month after the Hickman debt is paid) first to accrued interest on all debts of Unit, Inc. or its partnerships to Farmers Bank and the remainder in reduction of the bond and mortgage which presently stands at $450,000; thereafter, to be applied against any other indebtedness of Unit, Inc. owing Farmers Bank, including its subsidiaries. Farmers Bank would reserve the right to change the allocation and application of the monthly payments, with notice to Unit promptly after the application has been made.

4. Unit, Inc. acknowledges that the assignment of Farmers Bank Building leases now of record from Unit, Inc. to Farmers Bank will remain as a recorded lien to secure the above arrangements and all indebtedness of Unit, Inc. to Farmers Bank, including its subsidiary.

Morris was asked to sign a carbon copy of the letter and return it by April 26, 1974, if he agreed to the proposal. The letter stated that if Farmers did not receive the agreement by that time, foreclosure proceedings on the $450,000.00 bond and mortgage would be initiated.

By telegram dated April 26, 1974, Unit advised Farmers that Unit agreed to the terms and conditions set forth in the April 16, 1974 letter and would confirm the telegram by executing and returning said letter. The letter was executed by Morris and returned to Farmers.

Each month from May, 1974 through September, 1975, $10,000.00 was charged to Freidco's account by Farmers with the exception of October 1974, when $5,000.00 was charged. On July 8, 1975 Farmers served notice on Unit that the $2,000.00 per month previously allocated to Hickman and Company would "now be applied to sublease payments which have not been made since August, 1974." When the withdrawals were terminated as a result of Freidco–Wilmington's Chapter XII petition, Farmers had withdrawn a total of $165,000.00.

## ANALYSIS

Section 1972 of the Bank Holding Company Act provides in part:

(1) A bank shall not in any manner extend credit, lease or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement—

(A) that the customer shall obtain some additional credit, property, or service from such bank other than a loan, discount, deposit, or trust service;

\* \* \* \* \* \*

(C) that the customer provide some additional credit, property, or service to such bank, other than those related to and usually provided in connection with a loan, discount, or trust service;

\* \* \* \* \* \*

(E) that the customer shall not obtain some other credit, property, or ser-

vice from a competitor of such bank, ... other than a condition or requirement that such bank shall reasonably impose a credit transaction to assure the soundness of the credit.

12 U.S.C. § 1972 (1979 Supp.).

Section 1975 of the Act provides:

Any person who is injured in his business or property by reason of anything forbidden in section 1972 of this title may sue therefor in any district court of the United States in which the defendant resides or is found or has an agent, without regard to the amount in controversy, and shall be entitled to recover three times the amount of the damages sustained by him, and the cost of suit, including a reasonable attorney's fee.

12 U.S.C. § 1975 (1979 Supp.).

These provisions were added to the Act by amendment in 1970. They, as well as their relatively sparse legislative history, reflect a Congressional concern about misuse of the economic power possessed by banks. That concern was sufficiently grave that it was deemed appropriate in three specified situations to impose treble damages upon a bank [3] without proof that it possessed market power or that its activities had an anti–competitive effect in the marketplace.[4]. These situations include two which have been consistently recognized in antitrust law as having great potential for anti–competitive impact. Subparagraph (A) forecloses a bank from utilizing its market power in one market to command patronage in another through a "tying" arrangement which requires the purchaser of one product or service to also buy another product or service. Subparagraph (E) is directed to extensions of market power through "exclusive dealing" arrangements.

---

3. Section 1972 imposes *per se* liability on bank holding companies in additional situations.

4. The Senate Report, for example explains:
   Because of their inherent anti–competitive effects, which may operate to the detriment of bank customers as well as banking and nonbanking competitors, tying arrangements involving a bank are made unlawful by this section without any showing of specific adverse effects on competition or other restraints of trade and without any showing of some degree of bank dominance or control over the tying product or service.
   Sen.Rep. No. 91–1084, 91st Cong., 1st Sess.

■ The third situation in which Section 1972 imposes *per se* liability on a bank for treble damages is not one which has traditionally been treated by the antitrust law as posing a similar threat to competition.[5] Section (C) forecloses a bank from selling credit, property or services on the condition that the customer *provide* the bank with something of value (1) in what would otherwise be a separate transaction, or (2) in the same transaction unless that thing of value is of a kind "usually provided" by customers in connection with such sales. Contrary to Farmers' suggestion, I think it clear from the wording of subsection (C) that the scope of Section 1972 is not limited to situations in which the banks attempt to utilize the market power which it is deemed to have under the Act in another market or in what would otherwise be a separate transaction. On the other hand, it seems clear that Congress did not intend to "federalize" large segments of existing commercial and banking law, or to impose treble damage liability whenever a federal court might conclude that the specific terms of a loan transaction were onerous or uncommon for some other reason. Section 1972 is not a general regulatory provision designed to insure fair interest rates, collateral requirements, and other loan agreement terms. It has a narrow target; it is "intended to provide specific statutory assurance that the use of the economic power of a bank will not lead to a lessening of competition or unfair competitive practices." S.Rep.No.91–1084, 91st Cong., 2d Sess. 3.

■ The plaintiffs in this case charge Farmers with having violated subsection (A) and (C) of Section 1972(1). Specifically, they contend that Farmers extended credit to Unit in April of 1974 upon the conditions (1) that Unit accept the management services of the Farmers' subsidiary, Hickman and Company, in connection with the operation of the Farmers Bank Building, and (2) that Unit provide property both in the form of a commitment to authorize withdrawals of $10,000 per month from the Freidco checking account and in the form of an assignment of rentals from the Farmers Bank Building leases.[6] Farmers counters that it did not extend credit to Unit in April of 1974, that it did not require Unit to accept managerial services, and that everything required of Unit in the April 16th letter was in accordance with traditional banking practice.

The initial question—whether there was an extension of credit in April of 1974—must be answered in the affirmative. Unit was indebted to Farmers on obligations which were then past due. Farmers agreed, on certain conditions, to accept payment of those obligations in installments over a future period of time. An agreement to thus defer payment of an obligation is within the commonly accepted understanding of an extension of credit[7] and an interpretation of the Act which would place such agreements beyond its scope would tend to frustrate the Congressional purpose. The potential for misuse of economic power by banks is at least as great when the customer is negotiating a "workout" and considering alternative means of refinancing as when a new loan is being sought.

I agree with Farmers, however, that this extension of credit was not on the condition that Unit contract with the bank's subsidiary for management services. In context,

5. While there is at least one reference in the legislative history to "reciprocity", subsection (C) is not aimed at what have traditionally been referred to in the antitrust law as reciprocity arrangements. See *Bass v. Boston Five Cent Sav. Bank*, 478 F.Supp. 741, 748 (D.Mass.1979); *United States v. Penick and Ford Ltd.*, 242 F.Supp. 518 (D.N.J.1965).

6. Plaintiffs make two related arguments which do not require separate analysis. Unit argues that Unit was required to provide a service in the form of an "automatic charge" on the Freidco account. This unduly strains the concept of a "service" as used in the Act. Finally, it is suggested that the application of the withdrawals to the overdue sublease payments in July of 1975 was a requirement that Unit supply property as a condition of an extension of credit. My analysis and conclusion with respect to the application of the $10,000 withdrawal prior to July of 1975 is equally appropriate here.

7. *See, e. g.*, 18 U.S.C. § 891(1); 15 U.S.C. § 1691a(d); *Gilbert v. Atlantic Richfield Co.*, 448 F.Supp. 440, 443 & n. 1 (D.Conn.1978).

the April 16th letter cannot fairly be read to require such a contract. The requirement was that Unit authorize the deposit of Farmers Bank Building rentals to Freidco's account so that monthly withdrawals could be made. As the letter itself suggests, this requirement was stated in terms of Unit's authorizing Hickman and Company to make the deposits simply because that firm was "its managing agent for the Farmers Bank Building" at that time.[8] Accordingly, Farmers did not violate Section 1972(1)(A).

Plaintiffs' arguments that Section 1972(1)(C) was violated, while somewhat more plausible, are nevertheless unpersuasive. Plaintiffs acknowledge, as they must, that any extension of credit will be conditioned upon some commitment to repay and that, if installment payments are "property", they are property of a kind "usually provided in connection with a loan." They also concede that assignments of lease rentals are commonly provided to banks as collateral for loans. What made Farmers' demands for monthly installment payments and collateral uncommon in this situation, in the plaintiffs' view, is that the extension of credit was to Unit while the installment payments and leases were assets of Freidco–Wilmington. The question, accordingly, is whether this fact deprives the installment payments and assignment of their status as "property . . . usually provided in connection with a loan."

In support of their position, plaintiffs rely upon the testimony of their banking expert. He testified that monthly installments and lease assignments as collateral are commonplace, and indeed, that it was not unusual for a customer to pledge property of an affiliated entity. He indicated, however, that it was highly unusual for a bank in Farmers' position to extend credit in reliance upon a commitment to provide funds and collateral without requiring some written evidence that the commitment was authorized by all having an interest in those funds and collateral.[9] Even if this testimony be credited, however, it does not lead to the conclusion that Farmers should be held liable to Unit or Freidco–Wilmington for treble damages under the Bank Holding Company Act.

The text of Section 1972(1)(C) can perhaps be read literally to impose *per se* tre-

---

**8.** This reading conforms to the economic realities of the situation. Farmers had no concern about Hickman and Company's keeping the Farmers Bank Building account. Hickman and Tingle were committed to provide management services to Freidco–Wilmington without further charge and there was no reason to believe that they would wish to satisfy this obligation by retaining anyone other than Hickman's own firm, who had handled the operation since its inception.

**9.** What would be proper practice is not altogether clear from Mr. Dix's testimony. He testified as follows on direct:

If Unit owed Farmers Bank about $450,-000.00 and the loan was overdue and if Farmers knew that the funds of Freidco which were deposited in the bank could be drawn on only by Unit, but that Unit owned less than all of its Freidco partnership, specifically 80% or less; and that $10,000.00 a month was more than Unit's share or likely to be more than Unit's share of the monthly income from the partnership, would it be ordinary and proper bank practice to require under threat of foreclosure of Unit's property, that Unit sign documents authorizing the withdrawal of $10,000.00 a month from the Freidco account?

\*    \*    \*    \*    \*    \*

Q Do you have an opinion?

A It's standard practice to seek the acknowledgment of all parties to that entity if in fact that you're asking for funds from a source other than the borrowing entity and have those acknowledgments as a matter of record.

Q You're under the hypothetical–I got–I gave you–assuming only that the general partner's agreement was requested, you're saying it would not be proper practice?

A I think it's very important for the bank to make sure that all parties to that, the funding entity in this case, the one with the money and making the monthly charges were aware and acknowledge the fact that this transaction was going to occur.

(Dix. pp. 24–25). Subsequent testimony suggests, however, that a signature of a general partner qua general partner, would suffice unless there was "cause to believe" that the payments would appropriate a limited partner's interest. Here Farmers had such cause, although the record does not indicate it had reason to believe that Hickman and Tingle had not consented.

ble damage liability for any loss arising from a loan transaction which for some reason was not a normal, run–of–the–mill one. To so read it, however, would extend its scope far beyond anything suggested by the section as a whole or its legislative history. The more reasonable construction is that the terms and effectuation of a credit transaction need not be reviewed by a court under the Act if the only credit, property or service required of the customer is related to the loan and is of a character commonly provided in connection with a loan. Since this record establishes that the $10,000 monthly withdrawals and the assignment of rentals meet these criteria, a judgment will be entered in favor of Farmers on the Bank Holding Company Act claims.

By so holding, I do not, of course, suggest that Unit may not be liable to Freidco–Wilmington for diverting partnership property in breach of its fiduciary duty or that Farmers may not be liable to Freidco–Wilmington or Unit for knowingly inducing that alleged breach of trust.[10] These questions remain to be litigated in this case. At this time, I hold only that plaintiffs have not proved a factual situation to which Section 1972 applies.

---

**10.** Nor do I express any opinion on whether any liability could be predicated on Farmers' threat to foreclose upon the pledge of rents when it knew the obligation which the pledge was given to secure had been fully satisfied.