The NEW ENGLAND COMPANY,
Plaintiff,

v.

The BANK OF GWINNETT COUNTY,
f/k/a Button Gwinnett National
Bank, Defendant.

Civ. A. No. 1:95–CV–92–FMH.

United States District Court,
N.D. Georgia,
Atlanta Division.

July 13, 1995.

Dana Brent Miles and Michael Charles McGoff, Miles & Reese, Atlanta, GA, for plaintiff.

Thomas T. Tate, Andersen, Davidson & Tate, Lawrenceville, GA, for defendant.

## *ORDER*

HULL, District Judge.

This matter is before the Court on Defendant's Motion to Dismiss [4–1]. The Court accepts Plaintiff's allegations as true for purposes of reviewing Defendant's Motion to Dismiss.

## I. *FACTS*

Plaintiff New England Company is in the business of providing lease financing to its customers. To facilitate this business, Plaintiff obtained a $500,000 line of credit from Button Gwinnett National Bank in 1991. Under that credit agreement, Plaintiff could

write indirect and direct leases up to a total of $500,000 for the direct lease transactions. For the direct leases, the only requirement of Plaintiff was that the lease have a 10% equity with the first two payments being made in advance by Plaintiff's customers.

Each time Plaintiff financed a direct lease, Plaintiff would draw down the line of credit to fund the lease. At the same time Plaintiff would execute a note in favor of Button Gwinnett for the amount of that draw and would assign Button Gwinnett a security interest in the underlying lease from Plaintiff's customers. These lease payments were calculated to equal or exceed the amount that Plaintiff owed on the notes to Button Gwinnett. Plaintiff would receive those lease payments directly from its customers and forward to Button Gwinnett only the amounts owed on the line of credit.

During 1993, Button Gwinnett merged with the Bank of Gwinnett County and the surviving entity became known as the Bank of Gwinnett County ("the Bank"), Defendant herein. Chris Fluehr was the first loan officer at Button Gwinnett who was responsible for Plaintiff's line of credit. Before leaving the employment of Button Gwinnett in February of 1992, Mr. Fluehr came to Plaintiff's offices with Andy Pourchier, another Bank officer, to acquaint him with the terms of the line of credit agreement and to review the history of the Bank's dealings with Plaintiff. Mr. Fluehr also introduced Plaintiff's President to Pete Coley, another officer at the Bank, and again reviewed the terms of the agreement and the history of the dealings on the line of credit.

At all times during the existence of the line of credit agreement, Plaintiff made all payments in a timely fashion and fully performed all other obligations. Despite the Plaintiff's full, good faith performance under the line of credit, Button Gwinnett refused to allow Plaintiff further draws on this line of credit beginning in September, 1992. From September, 1992 until February, 1993, Plaintiff continued to submit draw requests for its new lease customers, but these requests were deferred or declined with the explanation that Button Gwinnett was going through a merger, or that the credit risk of the proposed lessee was high. Neither of these reasons is contained as a condition in the line of credit agreement with Plaintiff.

After being denied access to the line of credit for new leases, Plaintiff's President attempted to contact senior officers at the Bank to discuss this matter, but was rebuked by loan officer Pete Coley for pressing the issue. Instead, Mr. Coley reiterated that Plaintiff should be patient because of the pending merger. In late February, 1993, Glenn White, President of the Bank, called a meeting with Plaintiff's President to discuss the line of credit. At the meeting, Mr. White advised Plaintiff's President that Plaintiff's line of credit was a risky loan and that Plaintiff would not be entitled to draw on that line of credit unless each lease had 25% equity and the lease customer was located in Gwinnett County. Additionally, Plaintiff was told that no further withdrawals would be made on the line of credit unless Brian Clark, Plaintiff's President, and his wife, Tracy Clark, personally guaranteed Plaintiff's payment of the line of credit and provided the Bank with a security interest in their home.

Prior to this ultimatum, Plaintiff had never been advised by Button Gwinnett or the Bank that its loan was classified as risky. Moreover, Plaintiff has never been advised that any of its payments were late or that Plaintiff had defaulted in any way on its line of credit. Prior to this ultimatum, Plaintiff had never been given notice that the Bank was going to change the terms of its line of credit agreement, nor had Plaintiff been given reasonable opportunity to secure alternate financing elsewhere before the new credit conditions were imposed. Because Button Gwinnett refused further advances on the line of credit beginning in September, 1992, Plaintiff lost a number of new lease opportunities.

Beginning in 1992, the Bank began contacting Plaintiff's customers and, among other things, encouraged them to tender early payoffs of their outstanding lease obligations to Plaintiff. These contacts were made without the knowledge or consent of Plaintiff and Plaintiff alleges that these contacts interfered with Plaintiff's business relationships

with its customers. As a result of these contacts, at least one of Plaintiff's customers called to inquire whether Plaintiff was in financial trouble and to seek early termination of its lease obligation. At that point, Plaintiff's president called Pete Coley, a loan officer with the Bank, to inquire why Plaintiff's customers were being contacted by the Bank and encouraged to tender early payoffs. Mr. Coley only placed pressure on Plaintiff to accept the early payoffs. As a direct result of the Bank's contacts, and the pressure from Mr. Coley to accept the early payoff, Plaintiff lost profits on at least one lease that paid off early to the benefit of Defendant and the detriment of Plaintiff. Because Defendant refused to honor the terms of the credit agreement with Plaintiff, Plaintiff took steps to mitigate its damages and secure alternate financing elsewhere.

Plaintiff was successful in replacing $300,000 of its $500,000 line of credit with another financial institution, but Plaintiff has been unable to secure the additional $200,000 needed to run its business at the previous level.

On January 13, 1995, Plaintiff filed this Complaint under the anti-tying provision of the Bank Holding Company Act, 12 U.S.C. § 1972(1)(C) (1994). Plaintiff alleged, *inter alia*, that the Bank impermissibly conditioned the further extension of credit to Plaintiff on Plaintiff's President and his wife's personally guaranteeing any extension of credit. Plaintiff also filed several state law causes of action.

On February 24, 1995, the Bank filed a Motion to Dismiss [4–1], contending that Plaintiff's allegations do not state a claim upon which relief can be granted under the Bank Holding Company Act ("BHCA"). The Bank also requests that once Plaintiff's BHCA claim is dismissed, the Court should dismiss Plaintiff's remaining state law claims for lack of subject matter jurisdiction.

## II. *DISCUSSION*

### A. *THE BANK HOLDING COMPANY ACT*

 The anti-tying provision of the BHCA proscribes banks from tieing the ex-

tension of credit to a potential debtor's provision of an unrelated service or product to the bank, as follows:

> (1) A bank shall not in any manner extend credit, lease or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the forgoing, on the condition or requirement—
>
> . . . . .
>
> (C) that the customer provide some additional credit, property, or service to such bank, other than those related to and usually provided in connection with a loan, discount, deposit, or trust service. . . .

12 U.S.C. § 1972(1)(C) (1994). In order to state a cause of action under the anti-tying provision of the BHCA, Plaintiff must prove three elements: (1) the Bank has engaged in an unusual practice; (2) that the Bank's actions were anti-competitive; and (3) that the actions were to the benefit of the Bank. *Parsons Steel v. First Alabama Bank of Montgomery*, 679 F.2d 242, 246 (11th Cir. 1982). In essence, the Bank argues that Plaintiff has failed to allege that the Bank has engaged in any anti-competitive acts.

In interpreting the language of the BHCA, courts repeatedly have noted that it was not Congress's intent to federalize the regulation of the banking industry. *Bieber v. State Bank of Terry*, 928 F.2d 328, 330 (9th Cir. 1991) ("Congress did not intend to 'interfere with the conduct of appropriated traditional banking practices.'" (citation omitted)); *Palermo v. First Nat'l Bank & Trust Co.*, 894 F.2d 363, 368 (10th Cir.1990) ("[I]t seems clear that Congress did not intend to 'federalize' large segments of existing commercial or banking law. . . .") (quoting *Freidco v. Farmers Bank*, 499 F.Supp. 995, 1001 (D.Del. 1980)); *Davis v. First Nat'l Bank of Westville*, 868 F.2d 206, 208 (7th Cir.1989) (noting that the statute is only concerned with arrangements traditionally targeted by the antitrust laws). Quite the contrary, the language of the Act itself excepts from its ambit conduct "related to and usually provided in connection with a loan. . . ." 12 U.S.C. § 1972(1)(C) (1994). Congress did not intend to "interfere with the conduct of appropriate

traditional banking practices." *Parsons Steel*, 679 F.2d at 245 (quoting S.Rep. No. 91–1084, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.C.C.A.N. 5519, 5535 (1970)). Congress was concerned that regulation of the banking industry under the BHCA not be overly expansive, but rather limited to anti-competitive acts by banks related to the extension of credit. *Palermo*, 894 F.2d at 368; *Amerifirst Properties v. FDIC*, 880 F.2d 821, 826 (5th Cir.1989); *Davis*, 868 F.2d at 208; *Parsons Steel*, 679 F.2d at 245; *McCoy v. Franklin Savings Ass'n*, 636 F.2d 172, 175 (7th Cir.1980).

■■■ The original focus of the BHCA was the regulation of the power of bank holding companies to prevent a small number of powerful banks from dominating commerce and to ensure a separation of economic power between banking and commerce. *Id.* at 244; S.Rep. No. 91–1084, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.C.C.A.N. 5519, 5535 (1970); 116 Cong.Rec. 32127 (1970). In 1970, Congress amended the Act to reach the anti-competitive practices of even smaller banks, which notwithstanding their comparative size, were able to exert economic power over businesses because of their control over credit.[1] In so doing, Congress did not intend to prohibit attempts by banks to protect their investments where no anticompetitive practices were involved. *Palermo v. First Nat'l Bank & Trust Co.*, 894 F.2d 363, 368 (10th Cir.1990); *Davis v. First Nat'l Bank of Westville*, 868 F.2d 206, 207 (7th Cir.1989); *Parsons Steel v. First Ala. Bank of Montgomery*, 679 F.2d 242, 246

(11th Cir.1982); *Tose v. First Penn. Bank, N.A.*, 648 F.2d 879, 897 (3d Cir.1981); *B.C. Recreational Indus. v. First Nat'l Bank*, 639 F.2d 828, 832 (1st Cir.1981); *McCoy v. Franklin Savings Ass'n*, 636 F.2d 172 (7th Cir.1980); *Duryea v. Third Northwestern Nat'l Bank*, 606 F.2d 823 (8th Cir.1979); *Costner v. Blount Nat'l Bank*, 578 F.2d 1192 (6th Cir.1978); *Clark v. United Bank of Denver*, 480 F.2d 235 (10th Cir.), *cert. denied*, 414 U.S. 1004, 94 S.Ct. 360, 38 L.Ed.2d 240 (1973).

### B. *PLAINTIFF FAILS TO STATE A CLAIM UNDER THE BHCA*

#### 1. *The Bank Engaged in No Unusual Banking Practice*

■ In order to state a cause of action under the anti-tying provision of the BHCA, Plaintiff must show that the Bank has engaged in an unusual practice. *Parsons Steel v. First Alabama Bank of Montgomery*, 679 F.2d 242 (11th Cir.1982). Here, Plaintiff has failed to alleged that the Bank engaged in any unusual conduct. At the most, Plaintiff alleges that the Bank breached the agreement entered into by Plaintiff and the Bank. The Button Gwinnett National Bank granted Plaintiff a $500,000 line of credit, but subsequently merged with the Bank of Gwinnett County. After the merger, officials at the Bank advised that no further credit would be extended to Plaintiff unless Plaintiff's President and his wife personally guaranteed the extension of further credit, thereby further securing the loan. The Bank also required

---

1. In enacting the anti-tying provision of the BHCA, Congress was targeting anti-competitive banking practices. The act proscribes anti-competitive ties which condition the extension of credit on a condition designed to increase the economic power of the bank, and to reduce competition. Such a tie can manifest itself in many different forms. The bank can refuse to extend credit unless the consumer agrees to purchase a separate, unrelated bank service (a quintessential tie); the bank can condition the extension of credit on the consumer providing the bank with a specific product or service unrelated to the extension of credit (a reciprocal tie); or the bank can condition the extension of credit on the consumer's agreement not to engage in any transactions with one of the bank's competitors (an exclusive dealing arrangement). A tie can manifest itself in a number of other ways, but the

touchstone for actionability under the anti-tying provision of the BHCA is that the arrangement be designed to lessen competition or increase the economic power of the creditor bank. *Davis v. First Nat'l Bank of Westville*, 868 F.2d 206, 208 (7th Cir.1989) ("The antitrust laws are concerned with tie-ins and reciprocity agreements when they enable a party with sufficient power in one market to avoid the standard market criteria of price, quality, and service in another market and thereby lessen competition.").

The purpose and effect of Section 1972 is to apply general antitrust principles to the field of commercial banking without requiring plaintiffs to prove anti-competitive effect or market power. Nevertheless, the plaintiff must still complain of a practice that is anti-competitive. *Parsons Steel*, 679 F.2d at 245.

25% equity (an increase from 10%) in every lease Plaintiff financed. This also provided the Bank with further security.

■ The Court finds that the allegations in Plaintiff's Complaint fail to state a BHCA cause of action. Courts repeatedly have held that a bank's conduct in conditioning the further extension of credit on the debtor's providing additional security for the loan is not actionable under the BHCA. To be sure, courts have upheld a wide range of conditions placed upon debtors in efforts to protect the investment of the creditor-bank. *Alpine Elec. Co. v. Union Bank*, 979 F.2d 133 (8th Cir.1992) (finding that act of bank in using money in depositor's checking account to reduce debt of related corporation not actionable); *Bieber v. State Bank of Terry*, 928 F.2d 328 (9th Cir.1991) (bank required officers of corporation to personally guaranty loan of corporation); *Palermo v. First Nat'l Bank & Trust Co.*, 894 F.2d 363 (10th Cir. 1990) (required officers to personally guaranty loan of corporation); *Davis v. First Nat'l Bank of Westville*, 868 F.2d 206 (7th Cir. 1989) (bank required debtor to provide a business liquidation service); *Parsons Steel v. First Ala. Bank of Montgomery*, 679 F.2d 242 (11th Cir.1982) (required change in management); *Tose v. First Penn. Bank*, 648 F.2d 879 (3d Cir.) (required change in CEO), *cert. denied*, 454 U.S. 893, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981). Conditioning the extension of credit on measures designed to insure that the bank's investment is protected is well within traditional banking practices, and is not the kind of unusual or anti-competitive

practice that gives rise to a BHCA cause of action.[2]

■ Plaintiff contends that requesting additional security in this case was an unusual banking practice because Plaintiff had made all its payments on its line of credit in a timely fashion. However, it is not an unusual banking practice for a bank to request additional security, even when a loan is current. Banks constantly re-examine loan portfolios, especially after a merger, and re-evaluate the risks and security needs of its loans. This is precisely what happened here. When Plaintiff inquired of the Bank why it was refused further credit, the Bank reportedly responded that Plaintiff's loan was risky and requested additional security. This, if anything, is traditional banking conduct, not unusual conduct.

### 2. The Bank Engaged in No Anti–Competitive Acts

■ Plaintiff also has no claim under the BHCA because the Bank's actions were not anti-competitive. Plaintiff's Complaint does not allege that the Bank's actions lessened competition in any way or increased the Bank's economic power. Additionally, Plaintiff's Complaint does not allege that the Bank engaged in any anti-competitive act.

■ In order to state a valid claim under the BHCA, Plaintiff not only must allege that the Bank engaged in an unusual banking practice, but also must allege that the unusual banking practice was an anti-competitive tying arrangement benefitting the bank. *Parsons Steel*, 679 F.2d at 245.

**2.** Plaintiff cites to *Nordic Bank, PLC v. The Trend Group, Ltd.*, 619 F.Supp. 542 (S.D.N.Y.1985), for the proposition that requiring a borrower to guarantee loans on which it was not already obligated violates the BHCA. In fact, *Nordic Bank* holds only that such an allegation is adequate to state a claim under the BHCA; in any event, this is irrelevant to the case at hand. Plaintiff was not asked to guarantee any loans on which it was not already obligated.

Plaintiff also relies on *Swerdloff v. Miami National Bank*, 584 F.2d 54 (5th Cir.1978), in claiming that the Bank's requirement that Plaintiff's President and wife guarantee Plaintiff's line of credit gives a right of action to the individuals as well as to Plaintiff. However, *Swerdloff* held only the following:

We hold that the owners of 100% of the stock of a corporation who have been required individually to guarantee the corporation's loan must be considered just as much "customers" of the bank as the corporation through which they do business for the purposes of these provisions of the Bank Holding Company Act. *Id.* at 59.

The corporation in *Swerdloff* was not a party, and thus there was no ruling by the Court on its ability to state a claim against the bank. In the instant action, of course, Plaintiff's President and his wife are not parties. *Swerdloff* is, therefore, inapposite, and provides no authority for Plaintiff's position.

For such an anti-competitive tying arrangement to exist, Plaintiff must show the existence of anti-competitive practices which required Plaintiff to provide another service or product in order to obtain the product or service it desired. *Id.* Plaintiff has failed to allege such conduct.

The purpose and effect of Section 1972 of the BHCA "is to apply the general principles of the Sherman Antitrust Act prohibiting anti-tying arrangements specifically to the field of commercial banking, without requiring plaintiffs to establish the economic power of a bank and specific anti-competitive effects of tying arrangements." *Parsons Steel,* 679 F.2d 242, 245. *See also Exchange Nat'l Bank of Chicago v. Daniels,* 768 F.2d 140, 143 (7th Cir.1985). Nonetheless, "even under this 'relaxed' per se approach to banking tie-ins, a plaintiff seeking relief under [S]ection 1972 must still complain of a practice that is anti-competitive." *Davis v. First National Bank of Westville,* 868 F.2d 206, 208 (7th Cir.1989). This element of a BHCA claim was emphasized by the Eleventh Circuit in *Parsons Steel,* where the court held that "[u]nless the 'unusual' banking practice is shown to be an anti-competitive tying arrangement which benefits the bank, it does not fall within the scope of the Act's prohibitions." *Parsons Steel,* 679 F.2d at 245.

■■■ To support a claim of an illegal tying arrangement, the law requires a showing of two distinct products: a tying product, in the market for which the defendant has economic power; and a tied product, which the defendant forces on consumers wishing to purchase the tying product. *McGee v. First Federal Savings & Loan Ass'n,* 761 F.2d 647 (11th Cir.1985). Plaintiff therefore must show that the practice complained of is anti-competitive, that the practice results in unfair competition or could lessen competition, and that the practice benefits the Bank in some way other than merely allowing the Bank additional asset protection. *Palermo v. First National Bank & Trust Co.,* 894 F.2d 363, 368 (10th Cir.1990). In other words, tying arrangements that have no anti-competitive effect but are aimed at protecting the Bank's investment do not violate the BHCA. *Graue Mill Development Corp. v. Colonial Bank & Trust Co.,* 927 F.2d 988, 992 (7th Cir.1991).

In its Response to the Bank's Motion to Dismiss, Plaintiff offers the conclusory allegation that "[i]t requires no stretch of the imagination to see that an arbitrary refusal to fund and existing line of credit unless the borrower provides other property or service to the bank is a tying arrangement." Plaintiff's Response at 9–10. However, Plaintiff offers no support for its position that the Bank's actions are anti-competitive.

■■■ Plaintiff stresses that the cases the Bank refers to in its Motion to Dismiss all involved situations where "suspect" conditions were imposed initially, or where the debtor was experiencing financial difficulty. However, the Court finds that the cases the Bank refers to are on point. As discussed earlier, Banks constantly re-examine loan portfolios and re-evaluate the risks of each of its loans as well as its security needs. This holds true even if the loan is current. That Plaintiff had yet to miss a payment on its line of credit, and had not defaulted, does not instantly transform the Bank's effort to gain additional security before extending further credit into an unusual or anti-competitive banking practice.

To hold such would be to force district courts across the land to conduct inquiries into whether it is appropriate for banks in various circumstances to require additional security for their investments. This would result in exactly the type of application of the BHCA that Congress sought to avoid. The Bank's actions here are exactly those that Congress did not intend to regulate. *Bieber v. State Bank of Terry,* 928 F.2d 328, 330 (9th Cir.1991) ("Congress did not intend to 'interfere with the conduct of appropriated traditional banking practices.'" (citation omitted)); *Palermo v. First Nat'l Bank & Trust Co.,* 894 F.2d 363, 368 (10th Cir.1990) ("[I]t seems clear that Congress did not intend to 'federalize' large segments of existing commercial or banking law....") (quoting *Freidco v. Farmers Bank,* 499 F.Supp. 995, 1001 (D.Del.1980)); *Davis v. First Nat'l Bank of Westville,* 868 F.2d 206, 208 (7th Cir.1989) (noting that the statute is only concerned with arrangements traditionally tar-

geted by the antitrust laws); *Parsons Steel v. First Ala. Bank of Montgomery,* 679 F.2d 242, 245–46 (11th Cir.1982) (same). The Bank imposed new conditions on Plaintiff's use of its line of credit not to lessen competition in any way, but rather to provide additional security for a loan the Bank classified as risky. Thus, Plaintiff's Complaint fails to allege either an unusual or anti-competitive banking practice. Accordingly, the Court grants Defendant's Motion to Dismiss Plaintiff's federal claim under the Bank Holding Company Act.

## C. *PLAINTIFF'S STATE LAW CLAIMS*

 Plaintiff's only remaining claims against the Bank are state law claims. The Bank requests that the Court dismiss the state law claims for lack of subject matter jurisdiction. Also, the Court *sua sponte* may raise a jurisdictional defect at any time. *Barnett v. Bailey,* 956 F.2d 1036, 1039 (11th Cir.1992); *Fitzgerald v. Seaboard System R.R., Inc.,* 760 F.2d 1249, 1251 (11th Cir. 1985). Thus, the Court will examine whether it continues to have jurisdiction over this action.

 Since Plaintiff is a Georgia domiciliary and the Bank is a Georgia corporation, complete diversity does not exist. *Strawbridge v. Curtiss,* 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806). Thus, there is no basis for original federal jurisdiction over Plaintiff's state law claims against the Bank. The state law claims previously were before the Court properly as a supplemental claim supported by Plaintiff's federal question claim. *See* 28 U.S.C. § 1367(a) (1994). However, with the dismissal of Plaintiff's Bank Holding Company Act claim, there remains no independent original federal jurisdiction to support the Court's exercise of supplemental jurisdiction over the state claims against the Bank.

 The Court must now inquire into whether a jurisdictional basis exists to support these state law claims in federal court. The Court's inquiry is twofold. First, the Court must decide whether it has the power to hear the state law claims. Second, if the Court does have the power to hear the state claims, the Court must decide whether, in its discretion, it will retain jurisdiction over the state claims. *United Mine Workers v. Gibbs,* 383 U.S. 715, 725–26, 86 S.Ct. 1130, 1138–39, 16 L.Ed.2d 218 (1966).

 The question of whether subject matter jurisdiction exists is measured as of the time the Complaint was filed. *In re Carter,* 618 F.2d 1093 (5th Cir.1980). When Plaintiff filed this Complaint, Plaintiff was a Georgia domiciliary and the Bank was a Georgia corporation. When Plaintiff filed its Complaint, Plaintiff had a federal question claim against the Bank and Plaintiff's state law claims against the Bank was a proper exercise of the Court's supplemental jurisdiction. *See* 28 U.S.C. § 1367(a) (1994); *see also Palmer v. Hospital Authority of Randolph County,* 22 F.3d 1559, 1567 (11th Cir. 1994). The dismissal of Plaintiff's underlying Bank Holding Company Act claim does not deprive the Court of supplemental jurisdiction over the remaining state law claims. *See Palmer,* 22 F.3d at 1568; *Edwards v. Okaloosa County,* 5 F.3d 1431, 1433–35 (5th Cir.1994). Indeed, under 28 U.S.C. § 1367(c), the Court has the discretion to decline to exercise supplemental jurisdiction over a non-diverse state law claim, where the Court has dismissed all claims over which it had original jurisdiction, but is not required to dismiss the case. *See Palmer,* 22 F.3d at 1567–68.

 As the Eleventh Circuit made clear in *Palmer,* once a court decides that it has power to exercise supplemental jurisdiction under Section 1367(a), then the court should exercise that jurisdiction, unless Section 1367(b) or (c) applies to limit the exercise.[3] In this case, Section 1367(c) applies because the Court "has dismissed all claims over which it has original jurisdiction;" namely, Plaintiff's Bank Holding Company Act claim against the Bank. *See* 28 U.S.C. § 1367(c) (1994). While 28 U.S.C. § 1367(c) permits a

---

**3.** 28 U.S.C. § 1367 codifies the traditional concepts of ancillary and pendent jurisdiction under the name supplemental jurisdiction. Simply explained, Section 1367(a) grants the federal judiciary congressional approval to extend supplemental jurisdiction to the limits of the Constitution. Section 1367(b) and (c) reduce that grant.

court to dismiss any state law claims where the court has dismissed all the claims over which it had original jurisdiction, the court can also consider other factors. Where Section 1367(c) applies, considerations of judicial economy, convenience, fairness, and comity may influence the court's discretion to exercise or to not exercise supplemental jurisdiction. *See Palmer*, 22 F.3d at 1569; *Executive Software N. Am. v. United States Dist. Court*, 15 F.3d 1484, 1493 (9th Cir.1994); *Fallin v. Mindis Metals, Inc.*, 865 F.Supp. 834, 841 (N.D.Ga.1994).

Resolution of Plaintiff's state law claims depend on determinations of state law. State courts, not federal courts, should be the final arbiters of state law. *Hardy v. Birmingham Bd. of Educ.*, 954 F.2d 1546, 1553 (11th Cir.1992). When coupled with the Court's discretion to exercise supplemental jurisdiction under Section 1367(c), this Court finds that the state law claims remaining in this action are best resolved by the Georgia courts. This is especially true here where the Court dismisses the only claim over which it had independent subject matter jurisdiction this early in these proceedings. The Court finds that judicial economy, fairness, and convenience dictate having these state law claims decided by state courts.

## III. *CONCLUSION*

For the foregoing reasons, the Court GRANTS Defendant's Motion to Dismiss [4–1].

The Clerk is directed to enter final judgment in favor of Defendant on Plaintiff's federal claim under the Bank Holding Company Act, and final judgment dismissing Plaintiff's state law claims, without prejudice.

It is SO ORDERED.